573 F.2d 873
 Carl D. WEST, Plaintiff-Appellee-Cross-Appellant,
v.
Patricia Roberts HARRIS, Secretary of the United States
Department of Housing and Urban Development,
Defendant-Appellant-Cross-Appellee.
Andrew J. DAIGLE, Plaintiff-Appellee-Cross-Appellant,
v.
Patricia Roberts HARRIS, Secretary of the United States
Department of Housing and Urban Development,
Defendant-Appellant-Cross-Appellee.
 No. 76-2531.
 United States Court of Appeals,
Fifth Circuit.
 May 26, 1978.
Rehearing Denied July 28, 1978.
 
 Robert Kopp, Atty., Marta W. Berkley, Atty., Civil Div., Dept. of Justice, Washington, D. C., P. A. Bienvenu, P. Albert Bienvenu, Jr., Bienvenu, Foster, Ryan & O'Bannon, New Orleans, La., for defendant-appellant cross-appellee.
 Leopold B. Babin, Houma, La., for plaintiff-appellee cross-appellant.
 P. Albert Bienvenu, Jr., P. A. Bienvenu, Bienvenu, Foster, Ryan & O'Bannon, New Orleans, La., for National Flood Insurers Association (original defendant).
 Appeals from the United States District Court for the Western District of Louisiana.
 Before CLARK and GEE, Circuit Judges, and LYNNE*, District Judge.
 CHARLES CLARK, Circuit Judge:
 
 
 1
 These cases both involve claims by insureds under policies of flood insurance issued pursuant to the National Flood Insurance Act of 1968, 42 U.S.C.A. § 4001 et seq. After a consolidated trial Andrew J. Daigle won a jury verdict against the National Flood Insurers Association in the amount of $12,084.56, and Carl D. West won a verdict in the amount of $17,500.00, the policy limit. Judgment was entered pursuant to the verdicts, but on post-trial motion the amount of each judgment was reduced by the $200 policy deductible. On appeal the National Flood Insurers Association[1] contends (1) that the trial judge should have granted defendant's motions for directed verdict and for judgment notwithstanding the verdict since the evidence was insufficient to show that the damage was a direct loss by flood; (2) that the trial judge should have granted defendant's motions for directed verdict and for judgment notwithstanding the verdict since the undisputed evidence established that the damage resulted from a peril which the policies excluded from coverage; (3) that the jury awarded damages for items not covered by the policies; and (4) that the trial judge committed reversible error in instructing the jury. On cross-appeal the plaintiffs raise additional issues involving the recoverability of a penalty and attorney's fees provided by Louisiana insurance law and the recoverability of prejudgment interest. We reverse both cases and remand the West case for new trial on the issue of damages only.
 
 
 2
 Since these decisions turn on the terms of identical policies of insurance issued to the plaintiffs by the defendant, we will set forth those terms with some particularity. Upon the payment of a premium by the plaintiffs, the defendant agreed to insure the plaintiffs' homes in the Morgan City, Louisiana, area "against all DIRECT LOSS BY 'FLOOD' as defined herein . . . ." The policy defined "flood" as follows:
 
 
 3
 Wherever in this policy the term "flood" occurs, it shall be held to mean a general and temporary condition of partial or complete inundation of normally dry land areas from (1) the overflow of inland or tidal waters, (2) the unusual and rapid accumulation or runoff of surface waters from any source, or (3) mudslides which are caused or precipitated by accumulations of water on or under the ground.
 
 
 4
 Immediately below this definition was a "Perils Excluded" provision:
 
 
 5
 Perils Excluded This Company shall not be liable for loss:
 
 
 6
 (a) by . . . (3) water, moisture or mudslide damage of any kind resulting primarily from conditions, causes or occurrences which are solely related to the described premises or are within the control of the Insured (including but not limited to design, structural or mechanical defects, failures, stoppages or breakages of water or sewer lines, drains, pumps, fixtures or equipment, seepage or backup of water, or hydrostatic pressure) or any condition which causes flooding which is substantially confined to the described premises or properties immediately adjacent thereto;
 
 
 7
 (d) by fire, windstorm, explosion, erosion, earthquake, landslide or any other earth movement except such mudslides as are covered under the peril of flood, or by theft;
 
 
 8
 The Daigle policy had a term of March 31, 1973, to March 31, 1974, and the West policy had a term of April 16, 1973, to April 16, 1974.
 
 The Daigle Case
 
 9
 The plaintiff's evidence in the Daigle case showed that the Daigles had purchased their house new in 1966. The house had a slab foundation and was built on reclaimed swamp land. The soil prevalent throughout this area is a mixture of humus and clay which expands when wet and contracts when dry. These soil movements cause houses built on slabs to heave and settle slightly with soil moisture changes. Despite numerous wet and dry periods during the seven years before April 17-18, 1973, the Daigles noticed no structural damage to their house. During that time, however, they had found it necessary on occasion to purchase dirt fill for use in landscaping, gardening, and repairing "pot holes" which had developed in their yard.
 
 
 10
 On April 17-18, 1973, a twelve-to fourteen-inch rainfall inundated the Morgan City area. That rainfall caused flooding conditions in many sections of Morgan City, and the flood water was waist-deep in the street in front of the Daigles' house. The water reached a point approximately half the distance between the street and their house, the highest it had risen since they bought the house, but the flood waters never entered their house. Following this rainfall a severe drought occurred which lasted through August.
 
 
 11
 Mrs. Daigle testified that they noticed damage to their house almost immediately after the rainfall. They first heard cracking sounds, and then they observed small cracks in the walls that got bigger and bigger as time went by. Mr. Shumaker, a construction contractor who inspected the house in July 1973, confirmed that the cracking had occurred only a few months earlier, and Mr. Guillory, an architectural engineer, opined that "the flooding certainly had a direct effect on the matter."
 
 
 12
 This testimony was sufficient to support the jury's finding that the crack damage was a direct loss by flood. However, the plaintiff's proof also established how the flood caused this damage, and that proof brings into effect the policy's earth movement exclusion.
 
 
 13
 According to Mr. Guillory and Mr. Shumaker, the normal situation in Morgan City is for water to be kept in the drainage canals around Morgan City to maintain the water table for the sole purpose of stabilizing the soil. During the heavy rainfall of April 17-18, the soil became supersaturated with moisture, which caused the Daigles' house to heave, or rise, slightly. The municipal authorities became alarmed at the water accumulation in the canals, one of which was behind the Daigles' house, and they determined to drain the canals as rapidly as possible. The rapid draining of the canals lowered the water table quickly, with the result that the soil dried and the house settled unevenly, causing cracking in the slab, sheetrock, and masonry of the Diagle house.
 
 
 14
 Dr. Capozzoli, the soil expert who testified for the defendant, agreed that the drying of the soil caused the earth to sink and settle, and that in turn caused the damage to the Daigles' house. He differed from Mr. Guillory, however, about the effect the flood and its aftermath had on this process. Dr. Capozzoli was of the opinion that the settlement was in process before the flood due to the nature of the soil and that the flood played no more than a negligible role in causing the damage to the house. He did admit, however, that had a professional inspected the house immediately before the flood and found no cracks, and reinspected it immediately after the flood and found cracks, he would agree that the flood was a causative factor.
 
 
 15
 At the end of the plaintiff's evidence and again at the close of all the evidence, the defendant moved for a directed verdict both on the ground that the evidence failed to establish that the plaintiff's damage was a direct loss by flood and on the ground that the evidence established the applicability of several of the policy exclusions, including exclusion of all earth movement except mudslides. The trial judge, being of the opinion that the separate contentions as to coverage and exclusion were merely two sides of the same coin, denied the motion and submitted the case to the jury to determine whether the plaintiff suffered a direct loss by flood. The defendant renewed these contentions on motion for judgment notwithstanding the verdict, which the trial court denied. This action was error. The evidence entitled the defendant to judgment as a matter of law in the Daigle case.
 
 
 16
 The determination of the legal operation of the unambiguous language of a contract is a function for the court and not the jury. Nat Harrison Associates, Inc. v. Gulf States Utilities Co., 491 F.2d 578 (5th Cir. 1974); Gore v. American Motorists Insurance Co., 441 F.2d 10 (5th Cir. 1971); see Ammons v. Franklin Life Insurance Co., 348 F.2d 414 (5th Cir. 1965). In this case the undisputed facts show that the immediate cause of the Daigles' loss was earth movement which was not a mudslide, a peril excluded in unambiguous terms under clause (d) of the "Perils Excluded" section of the policy.
 
 
 17
 Regardless of the role the flood of April 17-18 played in bringing about the conditions that led to the damage of the Daigles' house, the testimony of Mr. Shumaker, Mr. Guillory, and Dr. Capozzoli established without contradiction that the immediate cause of the damage was the settlement of the house due to uneven soil support. The house sank because the earth below it shifted and settled as a result of loss of moisture in the soil. Regardless of whether this settlement had been in process over a long period of time or whether it occurred immediately after the flood and draining of the canals, it was still the result of earth movement.
 
 
 18
 In unambiguous terms the policy provides that the defendant "shall not be liable for loss . . . by . . . erosion, earthquake, landslide or any other earth movement except such mudslides as are covered under the peril of flood . . ." The policy does not cover loss caused by earth movement in the form of soil settlement. It unambiguously provides that the only earth movement covered is a mudslide caused or precipitated by accumulation of water on or under the ground. There is no evidence of a mudslide in this record, nor is there evidence that the general surface of the ground area was unlevel. The only mention of a mudslide was Mr. Guillory's definition of the term as mud sliding down an incline on the surface of the earth. Cf. 24 C.F.R. § 1909.1 (1977) (defining "mudslide" as a "flow . . . of liquid mud down a hillside . . .").
 
 
 19
 Since the Daigles' loss occurred in a manner that the policy clearly excluded from coverage, there was no issue of fact to be submitted to the jury. The trial court should have applied the policy exclusion to the undisputed evidence and directed a verdict for the defendant. We therefore reverse the judgment in favor of Mr. Daigle and direct the rendition of a verdict for the defendant.
 
 The West Case
 
 20
 This case was consolidated with the Daigle case for trial and both cases were simultaneously submitted to the same jury. The jury found that the Wests had sustained a direct loss to their property because of flood and awarded them the policy limit. Because of the different facts proved in this case, we sustain the liability portion of the judgment but reverse the award of damages.
 
 
 21
 According to Mr. West's testimony, the Wests purchased a four-year-old house in 1969. This house was in a different neighborhood from the Daigles' house. However, the testimony revealed that it too was built on reclaimed swamp land and was supported by a clay-humus mixture soil foundation that would expand and contract with soil moisture changes. At the time of purchase the Wests inspected the house thoroughly and found no evidence of cracks, defects, or structural damage, and they observed no such damage prior to the rainfall of April 17-18, 1973.
 
 
 22
 During this rainfall, flood water inundated the Wests' property and actually entered the house to a depth of one and one-half inches. Water damage to the floor tiles, air conditioning unit, wall boards, baseboards, and insulation was immediately apparent. Structural damage to the Wests' house became apparent two to three weeks after the flood: a sliding glass door began to jam, bricks began to pull away from the baseboard, a ridge appeared under floor tiles, and later an open crack in the floor appeared. Inspection of the house revealed that the concrete slab foundation had cracked in several places. Although the defendant apparently was willing to pay the Wests for the water damage, it denied coverage of the structural damage.
 
 
 23
 The major component of the structural damage was the cracking of the house's slab foundation. Mr. Patterson, a construction contractor who testified on behalf of the plaintiff, was of the opinion that repairing the existing structure would provide a temporary cure at best. He recommended and gave an estimate, which exceeded the policy limits, for demolishing the house and slab and rebuilding a similar house on a stronger or "beefed-up" slab. Mr. Patterson also attributed the failure of the foundation to the flooding of the area. A fair reading of his testimony, however, reveals that the structural damage to the Wests' house was also caused by earth movement other than a mudslide, thus bringing into play the same policy exclusion which applies in the Daigle case.
 
 
 24
 Although Mr. Patterson's testimony about how the flood caused the foundation to fail was not as clear as Mr. Guillory's testimony in the Daigle case, the gist of the testimony is the same. He testified that lowering the water table causes the soil to shrink, as a result of which the house drops down. He testified that the concrete slab supporting the Wests' house obviously sank in some areas because of the condition of the soil. The reason he wanted to "beef up" the slab of a new house was so that it could withstand any "positive negative pressure that may occur in any future flooding situation." In sum, the slab cracked because changes in the water table due to flooding and drainage of flood waters caused relative earth movements under the slab which created the positive and negative pressures which cracked it. The new stronger slab was required to resist similar forces in the future.
 
 
 25
 Dr. Capozzoli again testified for the defendant, and he concluded that the structural damage had been caused by soil movements and not by the flood. Although Dr. Capozzoli and Mr. Patterson differed as to the role the flood played in damaging the Wests' house, they were in agreement that lack of soil support caused the foundation to settle unevenly and crack.
 
 
 26
 The defendant moved for a directed verdict at the end of the plaintiff's case and again at the close of all the evidence on the ground, among others, that the evidence established the applicability of the provision excluding coverage of loss due to earth movement other than a mudslide. The trial judge denied these motions, and he later denied the defendant's motion for judgment notwithstanding the verdict, which was also made, in part, on the basis of this exclusion.
 
 
 27
 The trial judge erred in denying these motions, for the evidence presented by both sides established the immediate cause of the structural damage to have been earth movement other than a mudslide. As was discussed in the Daigle case, the policy clearly excludes such losses from its coverage, and the trial judge should have directed a verdict for the defendant insofar as the plaintiff was seeking to recover for structural damages.
 
 
 28
 Since the flood water entered the house and did some damage to the interior of the West home and to its contents, it is clear that the defendant has some liability under the policy it issued. However, the jury's award of $17,500 was based on Mr. Patterson's estimate of the cost to destroy the existing house and slab and to rebuild a similar house on a "beefed-up" slab, a procedure necessitated only by the cracking of the original slab. We reverse that verdict since the award was incorrectly based on the structural damages to the house and remand for a new trial on the issue of the amount of damages (less the $200 policy deductible) caused by the flood waters that entered the house.
 
 The Cross-Appeal
 
 29
 Since the defendant insurer does have some liability in the West case, we must consider the issues raised on cross-appeal concerning the applicability of Louisiana statutory law which allows a penalty and attorney's fees for the arbitrary refusal of an insurer to pay a claim, La.Rev.Stat.Ann. 22:658, and the availability of prejudgment interest to a prevailing plaintiff in an action brought on a flood insurance policy. The plaintiff argues that the state law provision on the penalty and attorney's fees is applicable in a diversity case on a flood insurance policy because the provision is not inconsistent with but in fact is harmonious with the federal scheme since it facilitates the prompt settlement of claims. The plaintiff argues that prejudgment interest is allowable both because Louisiana law allows prejudgment interest in such cases and because equity and general contract law support an award of such interest. The district court, though inclined to hold that the defendant had not acted arbitrarily or capriciously, denied the plaintiff's claims for the penalty and attorney's fees as a matter of law and also denied the plaintiff's claim for prejudgment interest. We affirm the judgment denying the penalty and attorney's fees and reverse the judgment denying prejudgment interest.
 
 
 30
 Whether the plaintiff is entitled to the penalty and attorney's fees granted by Louisiana statute turns on the fact that federal law is applicable in flood insurance cases. Mr. West originally filed this action in Louisiana state court against Aetna Casualty and Surety Company, the servicing agent of the National Flood Insurers Association with respect to the West policy. Although Congress granted jurisdiction in cases involving denials of claims under flood insurance policies to United States district courts without regard to diversity of citizenship or amount in controversy, 42 U.S.C.A. § 4053, Aetna removed this case to federal district court on the basis of diversity jurisdiction, alleging diversity of citizenship and over $10,000 in controversy, 28 U.S.C.A. § 1332. Subsequently the National Flood Insurers Association was added as a party defendant, and still later Aetna was granted summary judgment. The plaintiff argues that since this case is in federal court on the basis of diversity jurisdiction, the doctrine of Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), compels the court to apply state law.
 
 
 31
 We pretermit any determination of whether the district court exercised its jurisdiction under the diversity statute or under 42 U.S.C.A. § 4053. Although the basis for removal pleaded by Aetna, who turned out not to be the proper defendant, was diversity jurisdiction, the fact remains that Congress granted jurisdiction in disputes over the coverage of insurance policies issued pursuant to the National Flood Insurance Act to federal district courts without regard to diversity of citizenship or amount in controversy. We need not resolve whether the application of state or federal law should be determined by which of two jurisdictional statutes a party chooses to allege in invoking the court's jurisdiction, for even if this properly should be considered a diversity case federal law applies.
 
 
 32
 The National Flood Insurance Act of 1968 makes flood insurance available through a program with large-scale participation by the federal government and carried out to the maximum extent practicable by the private insurance industry. 42 U.S.C.A. § 4001(b), (d). Besides making insurance available in high-risk, high-rate areas, the Act also contemplates a unified national program for flood-plain management in order to reduce or avoid future flood losses. 42 U.S.C.A. §§ 4001(c), 4002(b). Thus, flood insurance is only available in those areas which have adopted land use and control measures conforming to federal criteria. 42 U.S.C.A. §§ 4012(c), 4102.
 
 
 33
 The Secretary of HUD is authorized to establish and administer the flood insurance program. 42 U.S.C.A. § 4011. The Secretary's involvement in the program was summarized by the Third Circuit in Commonwealth of Pennsylvania v. National Association of Flood Insurers, 520 F.2d 11 (3d Cir. 1975), as follows:
 
 
 34
 . . . (T)he Secretary is authorized to determine the priorities for insurance coverage, the manner in which insurance premiums are to be set, the mechanics of funding, the methods of paying claims, the limitations on payments and on the total amount of outstanding coverage, and the extent of federal financial subsidies for the insurance premiums. See 42 U.S.C. §§ 4012-4027; 1968 U.S.Code Cong. & Admin.News pp. 2967-73. . . .
 
 
 35
 Under the Act, 42 U.S.C. § 4041, the Secretary is first directed to implement the program by encouraging the formation of a pool of private insurance companies. The Secretary is then authorized to enter into an agreement with this insurance pool to make flood insurance policies available to the public with premiums subsidized by federal funds. 42 U.S.C. §§ 4041, 4051, 4052. The members of the insurance pool are to sell the insurance, adjust and pay claims and provide risk capital. 42 U.S.C. §§ 4052, 4053. The Secretary is authorized to make payments to the pool to subsidize premium rates and can make arrangements for reinsurance of the pool in case of excessive loss. 42 U.S.C. § 4055.
 
 
 36
 520 F.2d at 17. This description indicates the extensive administrative role the federal government plays in the provision of flood insurance as well as its financial role.
 
 
 37
 In addition to § 4053 which confers federal court jurisdiction without regard to diversity or amount, 42 U.S.C.A. § 4019 has an important bearing on the issue under consideration in this case. That section, dealing with payment of claims, provides:
 
 
 38
 The Secretary is authorized to prescribe regulations establishing the general method or methods by which proved and approved claims for losses may be adjusted and paid for any damage to or loss of property which is covered by flood insurance made available under the provisions of this chapter.
 
 
 39
 Congress has undertaken to regulate the claims adjustment process and judicial review thereof, and nowhere in these statutory sections or in the regulations implementing them, 24 C.F.R. §§ 1912.21, 1912.22 (1977), is there any mention of use of the statutory law of the forum state on any issue.
 
 
 40
 In discussing the law to be applied by a federal court, the Supreme Court stated in Erie : "Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state." 304 U.S. at 78, 58 S.Ct. at 822. Erie 's state law proviso does not apply when a federal statute dominates the subject matter in issue, see Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165 (1942), or when a uniform national rule is necessary to further the interests of the federal government. First National Bank, Henrietta v. Small Business Administration, 429 F.2d 280 (5th Cir. 1970), quoting Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943). Since the flood insurance program is a child of Congress, conceived to achieve policies which are national in scope, and since the federal government participates extensively in the program both in a supervisory capacity and financially, it is clear that the interest in uniformity of decision present in this case mandates the application of federal law. Cf. First National Bank, Henrietta v. Small Business Administration, 429 F.2d 280 (5th Cir. 1970). Thus, a prevailing plaintiff in a suit on a flood insurance policy issued pursuant to the National Flood Insurance Act is not entitled to recover the statutory penalty and attorney's fees allowed by state insurance law for arbitrary denial of coverage. Bains v. Hartford Fire Insurance Co., 440 F.Supp. 15 (N.D.Ga.1977); Drewett v. Aetna Casualty & Surety Co., 405 F.Supp. 877 (W.D.La.1975), aff'd on other grounds, 539 F.2d 496 (5th Cir. 1976); cf. Charleston & Western Carolina Railway Co. v. Varnville Furniture Co., 237 U.S. 597, 35 S.Ct. 715, 59 L.Ed. 1137 (1914) (South Carolina penalty statute for failure of an interstate carrier timely to pay a claim is invalid due to Congressional regulation of the liability of an interstate carrier). Contra, Davis v. Aetna Casualty & Surety Co., 329 So.2d 868 (La.App.1976) (on rehearing).
 
 
 41
 Nothing we say here is inconsistent with Drewett v. Aetna Casualty & Surety Co., 539 F.2d 496 (5th Cir. 1976). In that case, the plaintiff argued that the "loss-in-progress" principle should not be applied to a policy issued under the national flood insurance program since the National Flood Insurance Association is not an ordinary profit-seeking insurance company. In rejecting that argument the court stated:
 
 
 42
 Because the Program's exposure to claims and its premiums are required to be estimated in accordance with standard insurance practices, and because private insurers carry part of the risk, it is clear that Congress did not intend to abrogate standard insurance law principles which affect such estimates and risks.
 
 
 43
 539 F.2d at 498. The court did not hold the statutory or decisional law of any particular state to be applicable. Rather, it applied the "traditional common-law technique of decision" by drawing upon standard insurance law principles. Cf. D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 471-72, 62 S.Ct. 676, 686, 86 L.Ed. 956 (1942) (concurring opinion of Mr. Justice Jackson).
 
 
 44
 Nor does the insurance policy itself, which was drafted under the supervision of the Secretary of HUD, indicate that state statutes allowing penalties and attorney's fees should be applied in suits over coverage. The policy states:
 
 
 45
 Any terms of this policy which are in conflict with the statutes of the State wherein the property is located are hereby amended to conform to such statutes, except that in cases of conflict with applicable Federal law or regulation, such Federal law or regulation shall control the terms of this policy.
 
 
 46
 This provision is not applicable to this case, for no "(term) of this policy" is asserted to be in conflict with any Louisiana statute. The policy does not conflict with Louisiana law. The federal scheme, which this policy provision recognizes to be controlling, simply differs from the Louisiana scheme with respect to available remedies against an insurer who disallows claims.
 
 
 47
 In sum, federal law controls disputes over the coverage of insurance policies issued pursuant to the National Flood Insurance Act of 1968 regardless of whether the district court exercises jurisdiction under 42 U.S.C.A. § 4053 or under 28 U.S.C.A. § 1332. Congress has undertaken to establish a comprehensive flood insurance program under the control of the Department of HUD to achieve policies national in scope, and the interest in uniformity of decisions compels the application of federal law. As a result, a prevailing plaintiff is not entitled to recover the penalty and attorney's fees provided by Louisiana. Nothing in the decisional law of this circuit or in the provisions of the insurance policy points to a contrary conclusion.
 
 
 48
 It is clear from the foregoing discussion that the plaintiff is not entitled to an award of prejudgment interest from date of judicial demand based on La.Civ.Code Ann. art. 2924. Nevertheless, there remains an issue whether an award of prejudgment interest is required as a matter of federal law. We conclude that it is.
 
 
 49
 We reject the National Flood Insurers Association's contention that prejudgment interest is not allowable since the United States government subsidizes the flood insurance program. As a general rule, the United States is not liable for interest except where the liability is imposed by statute or assumed by contract. See United States v. Worley, 281 U.S. 339, 50 S.Ct. 291, 74 L.Ed. 887 (1930); Gray v. Dukedom Bank, 217 F.2d 108 (6th Cir. 1954). The National Flood Insurers Association is not an arm of the sovereign, but an association of private insurers. That the government has a financial stake in this program is not sufficient to cloak the defendant with the robe of sovereign immunity from awards of any interest. Cf. White v. Bloomberg, 360 F.Supp. 58 (D.Md.1973) (the postal service is an entity sufficiently independent of the government that a judgment against it is not one against the sovereign), aff'd 501 F.2d 1379 (4th Cir. 1974).[2]
 
 
 50
 The National Flood Insurers Association's principal argument against an award of prejudgment interest focuses on 28 U.S.C.A. § 1961, which provides interest on a money judgment in a civil case from the date of the entry of judgment. The Association asserts that in the absence of a positive congressional allowance of prejudgment interest, 28 U.S.C.A. § 1961 prohibits such an award. The decisions in this area, however, indicate that the Association's reading of the statute is mistaken and that prejudgment interest is an appropriate element of compensation for a plaintiff who is successful in recovering under a flood insurance policy.
 
 
 51
 28 U.S.C.A. § 1961 does not speak to the issue whether the judgment itself will include prejudgment interest as part of the plaintiff's compensation. Illinois Central Railroad Co. v. Texas Eastern Transmission Corp., 551 F.2d 943 (5th Cir. 1977). This court held in that case that 28 U.S.C.A. § 1961 does not preclude a carrier from an award of prejudgment interest in its action to recover demurrage charges from a shipper, explaining:
 
 
 52
 The statute (28 U.S.C.A. § 1961) does not limit successful plaintiffs to interest from the date of their judgments. Rather it indicates that the judgment itself will bear interest, as a matter of law, from the date it is entered, and leaves to other principles of law the issue of whether the judgment itself will include prejudgment interest as part of the plaintiff's compensation. As stated in Louisiana & Ark. Ry. Co. v. Export Drum Co., 359 F.2d 311, 317 (5th Cir. 1966), " § 1961 . . . has nothing to do with the question of whether prejudgment interest shall be allowed as part of the compensation awarded to make the injured party whole."
 
 
 53
 551 F.2d at 944 (emphasis in original). In Louisiana & Arkansas Railway Co. v. Export Drum Co., 359 F.2d 311 (5th Cir. 1966), the court concluded that prejudgment interest should be allowed in a suit under the Interstate Commerce Act by a carrier to recover freight charges that the shipper refused to pay. The rationale used by the court is equally applicable to a suit seeking recovery on an insurance policy:As the common law recognizes in analogous situations, the only way the wronged party can be made whole is to award him interest from the time he should have received the money. At the conclusion of the dispute, the parties should be in the same position regardless of whether the shipper does not pay the disputed amount, as here, and the carrier is forced to sue, or whether the shipper pays and then sues for an overcharge.
 
 
 54
 359 F.2d at 317. See also Rodgers v. United States, 332 U.S. 371, 373-74, 68 S.Ct. 5, 6-7, 92 L.Ed. 3 (1947).
 
 
 55
 The court in Export Drum relied in part on the fact that a sum certain was in controversy; however, prejudgment interest is also available on an unliquidated claim when necessary to arrive at fair compensation. Miller v. Robertson, 266 U.S. 243, 257-58, 45 S.Ct. 73, 78-79, 69 L.Ed. 265 (1924). In this case, although the amount of liability was not liquidated, it was based upon the readily ascertainable value of damages to property rather than personal injury. Under such circumstances it has been held that the better practice is to allow prejudgment interest as an element of compensation in the absence of strong equities to the contrary. See Eazor Express, Inc. v. International Brotherhood of Teamsters, 520 F.2d 951, 973 (3d Cir. 1975) (action by an employer against a union under the Labor Management Relations Act); Aetna Casualty & Surety Co. v. United States, 365 F.2d 997, 1006-07 (8th Cir. 1966) (action by a subcontractor against a surety under the Miller Act).
 
 
 56
 The major factor permeating these cases allowing prejudgment interest is that such an award is necessary to compensate an injured plaintiff. As a corollary, prejudgment interest is not allowed when it is not a necessary element of compensation. Thus this circuit in Barrios v. Louisiana Construction Materials Co., 465 F.2d 1157 (5th Cir. 1972), denied prejudgment interest on a Jones Act claim for personal injuries tried on the law side, explaining:
 
 
 57
 Unlike collision cases and wrongful death cases where the loss, although unliquidated, occurs at one time and is measurable as of that time, this is a case in which the damages awarded by the jury included substantial compensation for future pain and suffering and future loss of earnings.
 
 
 58
 465 F.2d at 1168. The examples of collision cases and wrongful death cases cited by the Barrios court were O'Donnell Transportation Co. v. City of New York, 215 F.2d 92 (2d Cir. 1954) (prejudgment interest in order to make the injured party whole is the general rule in admiralty cases), and National Airlines, Inc. v. Stiles, 268 F.2d 400 (5th Cir. 1959) (interest from the date of death is necessary to provide "fair and just compensation" in an action under the Death on the High Seas Act). Since Berry v. Sladco, Inc., 495 F.2d 523 (5th Cir. 1974), the case chiefly relied upon by the defendant, was a personal injury action under the Outer Continental Shelf Lands Act, the rationale of the Barrios court explains the result reached there. See also National Airlines, Inc. v. Stiles, 268 F.2d 400, 406 (5th Cir. 1959) (prejudgment interest is not necessary in a personal injury action where a plaintiff has the right "to recover for pain and suffering and injuries up to the date of trial and as to the future"). Although some courts have relied on 28 U.S.C.A. § 1961 to deny prejudgment interest in personal injury claims based upon federal law, as did the Berry court, these holdings are not to be read as relating to prejudgment interest awarded as part of the compensation to make the injured party whole. See Sanford Bros. Boats, Inc. v. Vidrine, 412 F.2d 958, 972-73, & n.12 (5th Cir. 1969).
 
 
 59
 The National Flood Insurance Act was intended in part to make insurance with adequate limits of coverage available to persons for flood losses. 42 U.S.C.A. § 4002(a)(5), (6). The damages recoverable are pecuniary in nature, not personal, and the amount is based upon the readily ascertainable value of services and property. Fair compensation to the plaintiff for his loss covered by the insurance policy issued by the defendant can only be achieved by including the award of prejudgment interest as a mandatory element of damages. See Louisiana & Arkansas Railway Co. v. Export Drum Co., 359 F.2d 311, 317 (5th Cir. 1966). On remand the district court should award Mr. West interest from the date payment was due under the policy provisions. As a matter of convenience and practicality, the amount of interest should be determined at the rate allowed by the law of the forum state. See Louisiana & Arkansas Railway Co. v. Export Drum Co., 359 F.2d at 317.
 
 
 60
 REVERSED AND RENDERED, IN PART, AND REMANDED, IN PART.
 
 
 
 *
 Senior District Judge of the Northern District of Alabama, sitting by designation
 
 
 [1]
 On April 5, 1978, over two months after oral argument in this case, Patricia Roberts Harris, Secretary of the Department of Housing and Urban Development (HUD), was substituted as party-appellant in the place of the National Flood Insurers Association. The Department of HUD assumed the operation of all of the insurance aspects of the flood insurance program previously performed by the National Flood Insurers Association on January 1, 1978. In conjunction with this undertaking, HUD agreed to assume responsibility for the continuation of coverage under policies previously issued by the Association, including the defense of pending claims asserted pursuant to such policies. This change in parties has no effect on the rights of these plaintiffs under the policies issued to them
 
 
 [2]
 The Department of HUD's assumption of the National Flood Insurers Association's liabilities does not change the extent of those liabilities