**GULF COAST INVESTMENT CORP.**

**v.**

**SECRETARY OF HOUSING AND URBAN DEVELOPMENT et al.**

Civ. A. No. 79–810.

United States District Court,
E. D. Louisiana.

Sept. 18, 1980.

Michael H. Bagot, John H. Gniady, New Orleans, La., for plaintiff.

Marc J. Yellin, Asst. U. S. Atty., New Orleans, La., Samuel B. Rothman, U. S. Dept. of Housing and Urban Development, Washington, D. C., for defendants.

## OPINION

SEAR, District Judge:

This is an action under a policy of flood insurance issued pursuant to the National Flood Insurance Act of 1968, 42 U.S.C. § 4001 *et seq.* On May 3, 1978, the insureds, Irvin and Bobbie York, sustained flood damage to their Marrero, Louisiana house. After their claim for flood insurance benefits was denied, the Yorks' mortgagee, Gulf Coast Investment Corporation (Gulf Coast), paid them for their loss and sued the Federal Emergency Management Agency (FEMA),[1] the present operator of the National Flood Insurance Program (NFIP) for the amount it paid.[2] In denying the Yorks' claim the defendant contends that their policy terminated more than fifteen months prior to the flood loss due to nonpayment of the renewal premium. Plaintiff asserts that the termination is invalid because the defendant failed to comply with a provision of the policy requiring written notice of termination.

As a condition to financing the purchase of the Yorks' home, their mortgage lender, Gulf Coast, required them to purchase a National Flood Insurance policy. The policy was purchased through Jimmy Phillips (Phillips), an insurance agent for Prudential Property & Casualty Insurance Company

1. Gulf Coast also sued Jimmy Phillips (Phillips), an insurance agent who sold the insureds their policy, and Prudential Property and Casualty Insurance Company (Prudential), the agency for whom Phillips worked, and the federal defendant cross-claimed against both Phillips and Prudential for indemnity; however, all claims against Phillips and Prudential were compromised prior to trial.

2. The NFIP was administered from June 6, 1969 until December 31, 1977, pursuant to 42 U.S.C. § 4041, as a private insurance industry program receiving federal financial assistance. At the program's inception, its operational aspects were the responsibility of the National Flood Insurance Association (NFIA), an unincorporated association of private insurance companies, under an agreement between the NFIA and the Department of Housing and Urban Development (HUD). The NFIA issued and serviced individual flood insurance policies, processed claims for losses, and accepted responsibility for the defense of legal actions brought by policyholders.

Upon termination of the contract between the NFIA and HUD on December 31, 1977, HUD assumed the administration of the NFIP, effective January 1, 1978, pursuant to 42 U.S.C. § 4071. HUD became the sole insurer of all outstanding flood insurance policies and operated all insurance aspects of the program previously performed by the NFIA. *See* Revisions of Parts 1911 & 1912, 24 C.F.R., at 42 F.R. 2570.

On April 1, 1979, all functions vested in HUD were transferred to the Director of the FEMA under section 202 of the Reorganization Plan No. 3 of 1978, 43 F.R. 41943, 92 Stat. 9808, set out in the Appendix to Title 5, U.S.C., Government Organization and Employees. Plaintiff originally named the Secretary of HUD as the federal defendant, but subsequently substituted the Director of the FEMA.

(Prudential). The Yorks paid the initial premium of $73.00 and the National Flood Insurance Association (NIFA)[3] issued policy number FC 104011908 effective for a one-year term January 21, 1976 to January 21, 1977. Gulf Coast agreed to pay subsequent annual renewal premiums from escrow funds collected with the mortgage payment.

On December 16, 1976, Gulf Coast received a NFIA Form 58 renewal notice covering the York policy which was generated by defendant's computer and dated December 10, 1976. The notice was mailed to Gulf Coast at its correct Houston, Texas mailing address.[4] The renewal notice advised that the insurance on the Yorks' property would expire January 21, 1977, that no further notice would be sent, and that to avoid a lapse in coverage, the renewal premium for the next annual term would have to be received by NFIA prior to the expiration date. It instructed that if the mortgagee was to pay the renewal premium, it should immediately contact the local agent (Phillips), who had been provided a renewal application. Finally, the form stated that if the policy was allowed to expire, the mortgagee would be provided written notice according to the policy conditions. The policy provided that the premium for successive policy terms must be paid prior to the expiration of the then current term, and

if not so paid, this policy shall then terminate; provided, however, with respect to any mortgagee . . ., this insurance shall continue in force only for the benefit of such mortgagee . . . for 20 days after written notice to the mortgagee . . . of termination of this policy, and then shall terminate.[5]

Rather than contacting Phillips regarding the renewal application, Gulf Coast mailed him a check[6] on January 13, 1977 to pay the premium for the period January 21, 1977 to January 21, 1978; however the defendant never received a renewal premium, so the Yorks' policy lapsed on January 21, 1977.

Richard E. Hulbirt, Gulf Coast's vice president in charge of flood administration, received the Yorks' loan file and testified that no such notice was received and the file did not contain a policy renewal certificate.

After a computer indicated that the policy had lapsed, Gulf Coast attempted to renew the policy for the following coverage year, January 21, 1978 to January 21, 1979.[7] Gulf Coast sent the renewal premium to Prudential on February 14, 1978,[8] more than three weeks after a renewal premium for the January 21, 1978 to January 21, 1979 coverage period would have been due. On February 24, 1978, Prudential returned the

---

3. See note 2, *supra*.

4. The address was provided on the Yorks' Application and Declarations Form. See Plaintiff's Exhibit No. 2.

5. Plaintiff's Exhibit No. 2.

6. *Id.*

7. Under cross-examination, Hulbirt testified as follows:

Q Did Gulf Coast attempt to renew the Yorks' flood insurance policy a second time?
A Yes, we did.
Q And why was this? Was it on the basis of having received a policy premium renewal notice?
A No, it was done from an expiration list, hazard insurance and expiration list, and it came up for renewal and we did not receive a renewal certificate notice therefore we sent our check, which is February 14, 1978 to Pru-Pack [*sic*].
Q What expiration list are you talking about?
A Well, we had—we have a hazard insurance plus it is separated into a flood expiration—flood insurance. Say, for example, the policy period would have come up for January 21, 1978. We would have found that this policy, or the renewal certificate—renewal certificate notice—apparently had not been received. Therefore we didn't have anything to go on other than what was previously set up on our records as far as a premium.
Q In other words, your computer told you the policy had lapsed, you better do something?
A Right.
Tr. at 32.

8. Plaintiff's Exhibit No. 5. The payee, Prupac, was Prudential's premium collection agency in Phoenix, Arizona. The $73.00 line item on the gross check referenced the Yorks' loan and initial flood insurance policy numbers.

payment to Gulf Coast indicating an overpayment remittance on the Yorks' homeowner's policy, which Prudential also issued; Gulf Coast then credited the Yorks' escrow account with an amount equal to the flood insurance premium. Again the Gulf Coast file does not indicate a renewal certificate for the January 21, 1978 to January 21, 1979 policy period.

On April 6, 1978, almost fifteen months after Gulf Coast sent its first renewal check to Phillips, its accounting department discovered that the check had not cleared its bank and on that date wrote the bank, inquiring about the status of the check. On May 9, 1978, six days after the Yorks' flood loss, Janet Thompson, the Gulf Coast employee primarily responsible for handling flood insurance renewals during the period pertinent to this case, requested a new flood insurance policy from another agent, and a new policy was issued, effective May 27, 1978.

In its effort to prove that it complied with the terms of the insurance contract by giving written notice of termination of the Yorks' policy to Gulf Coast, defendant offered the testimony of Mary Ralston, who served as an officer of the NFIA beginning in 1975, and later as a flood insurance consultant for the Department of Housing and Urban Development.[9] She testified regarding the program of the NFIA's computer for notifying parties with a possible interest in the policy renewal and that a termination notice dated March 18, 1977 was generated and sent to Aetna Technical Services, Inc. (Aetna), the servicing company in this instance.[10]

Although Ralston testified that magnetic tapes showing the work of the computer on a particular day, including the exact form generated, the date, and the policy number, were kept,[11] neither a copy of the mortgagee's termination notice nor a computer record of its production were offered into evidence. Nevertheless, Ralston testified she could state unequivocally that the NFIA Form 54 termination notice to Gulf Coast was generated, because the computer was programmed to produce the Form 55 termination notice Aetna received only after it produced Form 54. She testified that approximately one-and-one-half million NFIP policies are processed through the renewal programs annually, and she knew of no instance in which the computer omitted one of the notices or failed to complete a cycle. The computer kept a count of the number of items to anticipate from a given cycle, and the number was routinely verified against the items actually produced. The number of notices again was verified after insertion into envelopes, and the notices then were delivered by defendant to the post office and mailed at bulk rates.

Following the May 3, 1978 flood, the Yorks reported their flood damage to the local Prudential office, which, in turn, reported it to defendant, whose adjuster estimated the structural damage at $8,503.06.[12] After defendant denied the claim, Gulf Coast paid the Yorks that amount for their loss,[13] which it now seeks to recover from defendant.[14]

Federal jurisdiction over this matter is invoked pursuant to section 4072 of the National Flood Insurance Act of 1968, 42 U.S.C. § 4001 et seq. Federal law con-

---

**9.** See note 2, supra.

**10.** Defendant's Exhibit No. 1.

**11.** Ralston testified that when the NFIP was taken over by HUD from the NFIA, the tapes were turned over to the Federal Insurance Administrator of HUD, which, in turn, delivered them to its contractor, EDS Federal Corporation. See note 2 supra. In a colloquy with the Court, defense counsel explained that the magnetic tape, which would show that Gulf Coast's termination notice was generated, "is apparently in cold storage and just can't be retrieved,

and the information which was retrieved did not have those particular factors on it." Tr. at 111.

**12.** Plaintiff's Exhibit No. 6.

**13.** Id. No. 7.

**14.** Plaintiff originally also sought recovery from defendant of $7,015.65 it paid the Yorks for their contents loss; however, defendant's motion for summary judgment on that item was granted prior to trial.

trols disputes over the coverage of insurance policies issued pursuant to the Act. *West v. Harris*, 573 F.2d 873 (5th Cir. 1978). *Accord, Mason Drug Co., Inc. v. Harris*, 597 F.2d 886 (5th Cir. 1979). Accordingly, neither the statutory nor decisional law of any particular state is applicable to this case. *See West, supra.* Rather, I must apply "traditional common-law techniques of decision" by drawing upon standard insurance law principles. *See Drewett v. Aetna Cas. & Sur. Co.*, 539 F.2d 496 (5th Cir. 1976), *cited in West, supra.* Since insurance policies are contracts, basic contract rules govern the interpretation of a policy's terms. *Calcasieu-Marine Nat'l Bank v. American Employer's Ins. Co.*, 533 F.2d 290 (5th Cir. 1976). Where the terms of an insurance contract are clear and unambiguous, courts will not alter the agreement. *Id.* The existence *vel non* of ambiguity is a question of law. *Burton v. State Farm Fire and Cas. Co.*, 533 F.2d 177 (5th Cir. 1976).

■ The contract provision crucial to determination of this case simply states that the insurance shall continue in force for the mortgagee's benefit for twenty days "after written notice to the mortgagee . . . of termination of this policy." This provision is ambiguous because it could be reasonably construed to mean *either* "after written notice is mailed to the mortgagee" *or* "after written notice is delivered to the mortgagee."

■ Where statutes require that notice be given the insured before cancellation of an insurance policy is effective, courts frequently hold that a presumption of delivery is raised when the insurer proves proper mailing. *E. g., Broadway v. All-Star Ins. Corp.*, 285 So.2d 536 (La.1973), *construing* La.Rev.Stat. 22:636; *Traders & Gen'l Ins. Co. v. Mallitz*, 315 F.2d 141 (5th Cir. 1963). The purpose of notice provisions, however, is to inform the insured that his policy is being cancelled and to provide him sufficient time to obtain other insurance protection. *Broadway, supra; American Fid. & Cas. Co. v. Knox*, 164 F.Supp. 3 (W.D.La. 1958). Since an interpretation that permits a deposit in the mails to conclusively terminate coverage undermines the purpose of the notice, *Broadway, supra*, the presumption of delivery may be rebutted by "positive evidence of lack of delivery or receipt." *Mallitz, supra, quoting Skipper v. Federal Ins. Co.*, 238 La. 779, 116 So.2d 520, 523 (1959). *See Broadway, supra.* These rules have been developed for disputes involving cancellation notices, but they will be applied by analogy to this termination notice dispute, so that a rebuttable presumption of delivery of the termination notice will be raised upon proof of proper mailing.[15]

■ Both sides had considerable problems of proof on this issue. The bulk of defendant's testimony was devoted to establishing its procedures for handling all renewal and termination notices and the operation of its computer system, rather than the precise procedure followed in this case. Defendant urges that such evidence

---

**15.** There is a fundamental difference in meaning between "cancellation" and "termination," which, when used in insurance policies, are terms of art:

> "Cancellation" means termination of the policy prior to expiration of the policy period by act of one of the parties to the agreement; "termination" refers to the expiration of the policy by lapse under its own terms.

*State Farm Mut. Auto Ins. v. White*, 563 F.2d 971 (9th Cir. 1977), *citing Minnesota Mut. Life Ins. Co. v. Cost*, 72 F.2d 519 (10th Cir. 1934) and various state cases. The very terms of a contract for insurance coverage for a specified term, such as the one here, put the insured on notice that the policy will terminate if the renewal premium is not received prior to expiration of the coverage period. Statutes requiring affirmative cancellation by written notice generally are construed to apply only to cancellation and not to expiration or lapse because of nonpayment of premium, where the policy is for a specified term. J. Appleman, 14 Insurance Law & Practice § 8161, at 119 (West. Supp.1980). *See Edwards v. York*, 370 So.2d 614 (La.App. 4th Cir. 1979); *Robertson v. Southland Life Ins. Co.*, 204 S.E.2d 505 (Ga. App.1974); *Bek v. Zimmerman*, 285 Mich. 224, 280 N.W. 741 (1938). Nevertheless, since defendant's duty of providing written notice of termination to the mortgagee is imposed by the contract, the rules of *Broadway* and *Mallitz* will be applied by analogy so that a rebuttable presumption of delivery of notice is raised upon proof of proper mailing.

of the customary and usual computer procedures supports an inference that the termination notice was delivered in this case. Such an inference is permissible, because the evidence of the production and receipt of the renewal by Gulf Coast and the termination notice by Aetna implies that defendant's customary and usual procedure in producing termination notices was adhered to in this case. The computer was an unimaginative mechanical device that could not stray from its program.

On the other hand, the testimony of plaintiff's witness, Hulbirt, that a termination notice was absent from the Yorks' loan file supports an inference that the notice was not delivered to Gulf Coast.[16] Nevertheless, in weighing all the evidence on the issue of delivery, this testimony must be accorded very little weight. Hulbirt was not the custodian of termination notices, and there was no testimony that he was employed by Gulf Coast, particularly in the flood insurance section, prior to April 1, 1978, which was more than a year after the notice normally would have been received. Additionally, Gulf Coast's record-keeping was inadequate, as there was no established procedure for logging in termination notices when received. Furthermore, the Yorks' file was not adequately monitored for renewal certificates.

In sum, defendant proved a prima facie case of delivery of the termination notice in accordance with the insurance contract, which was not rebutted by plaintiff's evidence of nondelivery.[17] *Cf. United States v. Greenlee*, 517 F.2d 899 (3d Cir. 1975) (jury finding was permissible that evidence

of recordkeeping and computer procedures of Internal Revenue Service, together with testimony that no tax return was received from defendant for a particular year, established beyond a reasonable doubt that none was filed, despite self-serving evidence of defendant that he mailed it); *Nichols v. Unity Industrial Life Ins. Co.*, 71 So.2d 604 (La.App. 2d Cir. 1954) (testimony that as a matter of customary and usual policy in the conduct of its insurance business, insurer mailed premium-due notices to all policyholders, was sufficient to prove mailing of a particular notice, in light of lack of evidence of any variation from routine).

■ Even if defendant had not literally complied with the insurance contract by delivering notice of termination to plaintiff, there is another reason for denying plaintiff recovery. The Yorks' Standard Flood Insurance Policy contained no provision that they be given notice of termination. This suggests that the requirement of notice to the mortgagee and the twenty-day grace period must have been designed to give the mortgagee special protection when payment of the renewal premium was out of its control because it was to be made by the insured. In this case, it was the mortgagee's responsibility to make the renewal payments. Although it had notice the policy would expire if the payment was not timely made, the mortgagee did not fulfill its responsibility. The absence of a termination notice was not the reason the payment was not made; rather, Gulf Coast's inadequate recordkeeping and file review was the cause.

16. Federal Rule of Evidence 803(7) provides that evidence that a matter is not included in records kept in the course of a regularly conducted business activity, if offered to prove the nonexistence of the matter, is not excluded by the hearsay rule "if the matter was of a kind of which a . . . record . . . was regularly made and preserved, unless the sources of information or other circumstances indicate lack of trustworthiness." As the defendant did not object to plaintiff's evidence of the nonreceipt of the termination notice on hearsay grounds, the evidence is treated as properly admitted and given such probative effect and value as it is entitled

to. *See, e. g., United States v. Carney*, 468 F.2d 354 (8th Cir. 1972).

17. To require defendant to keep readily accessible records of every computer transaction in each of its one-and-one-half million flood insurance policies, or to send notices by certified mail to those with interests in the coverage, in order to defeat the claim of this plaintiff, which did not exercise due diligence in renewing the insureds' policy, might raise the cost of NFIP policies to prohibitive levels, defeating the congressional purpose of providing low-cost insurance to residents of flood-prone areas. *See* 42 U.S.C. §§ 4001, 4002.

Finally, to allow a one-year flood insurance policy to provide coverage in perpetuity when a mortgagee, which was not diligent in renewing the policy, does not receive a termination notice would serve no public policy. Thus, federal common law must require that the maximum period for which coverage may be extended to a mortgagee who proves nondelivery of a termination notice, under NFIP policy terms like those here, is twenty days from the date when the mortgagee had actual knowledge of expiration. The evidence in this case is that Gulf Coast had actual knowledge the policy lapsed at least by April 6, 1978, when it learned its first renewal premium check had not cleared the bank. Therefore, coverage expired no later than April 27, 1978, prior to the Yorks' flood loss.

Accordingly, plaintiff's claim is dismissed at its cost.

Based upon the evidence presented at trial, the arguments of counsel, and the law, I now enter the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1.

Irvin and Bobbie York acquired a flood insurance policy in January 1976 from Jimmy Phillips (Phillips), an agent for Prudential Property and Casualty Insurance Company (Prudential), covering their Marrero, Louisiana house. The policy was issued by the National Flood Insurance Agency (NFIA) pursuant to the National Flood Insurance Program (NFIP), a program presently administered by defendant, Federal Emergency Management Agency (FEMA).

2.

The Yorks' policy, required by their mortgage lender, plaintiff Gulf Coast Investment Corporation (Gulf Coast), was a single premium, annually renewable policy. The Yorks paid the initial premium for the period January 21, 1976 to January 21, 1977. Gulf Coast agreed to pay annual renewal premiums from escrow funds in the Yorks' loan account.

3.

On December 16, 1976, Gulf Coast received a policy renewal notice, advising that the Yorks' policy would expire January 21, 1977 if the NFIA did not receive a renewal premium prior to that date. Gulf Coast was instructed to contact Phillips, who had been provided a renewal application. The notice also advised that if the policy was allowed to expire, Gulf Coast would be provided written notice according to the policy conditions.

4.

The policy provided that the premium for successive policy terms must be paid prior to the expiration date of the then current term, and if not paid, would terminate; provided that the policy would continue in force only for the benefit of the mortgagee for twenty days "after written notice to the mortgagee" of termination.

5.

Gulf Coast did not contact Phillips regarding the renewal application, but mailed him a premium check on January 13, 1977. The check was never forwarded to defendant and the Yorks' policy lapsed on January 21, 1977.

6.

The Yorks' loan file at Gulf Coast did not contain a notice of termination from defendant; however, had Gulf Coast received such a notice, no record of its receipt would have been made. The file also did not contain a renewal certificate.

7.

Defendant's renewal and termination notices were produced for its one-and-one-half million policies by computer. A renewal application would be sent to the agent, and if the application was not completed and returned and the premium paid prior to the expiration date, a policy would lapse. About forty-five days after expiration, a termination notice would be generated and sent to the agent (NFIA Form 53) and to the mortgagee (NFIA Form 54), the latter notice explaining that the policy would continue in force for twenty days only for the benefit of the mortgagee. About forty-five

days after expiration, a termination notice would be generated and sent to the servicing company (NFIA Form 55).

8.

The servicing company for the Yorks' policy was Aetna Technical Services, Inc. (Aetna), which received a Form 55 notice of termination of the policy, dated March 18, 1977.

9.

The defendant's computer was programmed to generate the servicing company's termination notice, Form 55, after it first produced the mortgagee's termination notice, Form 54. Forms 54 and 55 were on the same program cycle. The computer was not known to omit programmed notices and always completed program cycles. It kept count of the number of items a given cycle should produce, and the number routinely was verified against the number of items actually produced at completion of the cycle.

10.

The number of notices again was verified after insertion into envelopes, and the notices then were delivered by defendant to the post office and mailed at bulk rates.

11.

Defendant followed its usual and customary procedure in this instance, producing a termination notice, Form 54, and mailing it to plaintiff at its correct address.

12.

After Gulf Coast's computer showed the Yorks' flood policy had lapsed, plaintiff attempted to renew it for the January 21, 1978 to January 21, 1979 coverage year by mailing a renewal premium to Prudential on February 14, 1978. Prudential returned that amount to Gulf Coast on February 24, 1978, referencing an overpaid remittance on the Yorks' homeowner's policy; Gulf Coast credited the Yorks' escrow account. It did not receive a renewal certificate for that coverage period.

13.

On April 6, 1978, Gulf Coast's accounting department discovered that the first renewal check to Phillips of January 13, 1977 had not been cancelled and returned by the bank. The insurance department was then notified of the check's status on April 27 or 28, 1978.

14.

The Yorks sustained flood damage to their house on May 3, 1978, which defendant's adjuster estimated at $8,503.06.

15.

Gulf Coast requested a new flood policy on May 9, 1978, from another agent, and a policy was issued effective May 27, 1978.

16.

Plaintiff did not exercise due diligence to secure insurance coverage on the Yorks' house prior to their flood loss.

17.

A claim was made under the Yorks' initial policy, but it was denied by defendant on the ground that the policy lapsed on January 21, 1977, prior to the flood loss. Plaintiff paid the Yorks $8,503.06, which it seeks to recover from defendant.

## CONCLUSIONS OF LAW

1.

This Court has jurisdiction over this claim pursuant to section 4072 of the National Flood Insurance Act of 1968, 42 U.S.C. § 4001 *et seq.*, and venue in the Eastern District of Louisiana is proper.

2.

Federal law controls disputes over the coverage of insurance policies issued pursuant to the Act. *West v. Harris*, 573 F.2d 873 (5th Cir. 1978). *Accord, Mason Drug Co., Inc. v. Harris*, 597 F.2d 886 (5th Cir. 1979). According to traditional common law techniques of decision, standard insurance law principles are applicable. *See Drewett v. Aetna Cas. & Sur. Co.*, 589 F.2d 496 (5th Cir. 1976), *cited in West v. Harris, supra.*

3.

Insurance policies are contracts; therefore, basic contract rules govern the interpretation of a policy's terms. *Calcasieu-*

*Marine Nat'l Bank v. American Employer's Ins. Co.,* 533 F.2d 290 (5th Cir. 1976). Where the terms of an insurance contract are clear and unambiguous, courts will not alter the agreement. *Id.* The existence *vel non* of ambiguity is a question of law. *Burton v. State Farm Fire and Cas. Co.,* 533 F.2d 177 (5th Cir. 1976).

4.

The contract provision pertinent to this case, which states that the flood insurance shall continue in force for the mortgagee's benefit for twenty days "after written notice to the mortgagee . . . of termination of this policy," is ambiguous because it could be reasonably construed to mean either "after written notice is mailed to the mortgagee" or "after written notice is delivered to the mortgagee."

5.

Where notice of cancellation to the insured is required by contract or statute, typically the rule applied is that a presumption of delivery is raised upon the insurer's proof of mailing. *E. g., Broadway v. All-Star Ins. Corp.,* 285 So.2d 536 (La.1973), *construing* La.Rev.Stat. 22:636; *Traders & Gen'l Ins. Co. v. Mallitz,* 315 F.2d 141 (5th Cir. 1963). The presumption of delivery may be rebutted by "positive evidence of lack of delivery or receipt." *Mallitz, supra,* quoting *Skipper v. Federal Ins. Co.,* 238 La. 779, 116 So.2d 529, 523 (1959). *See Broadway v. All-Star Ins. Corp., supra.*

6.

The rules regarding cancellation notice requirements are applied by analogy to termination notice requirements, so that a rebuttable presumption of delivery of notice is raised upon proof of proper mailing.

7.

Defendant proved a prima facie case of delivery of the termination notice in accordance with the insurance contract, which plaintiff did not rebut with positive evidence of lack of delivery or receipt.

8.

Even if notice of termination is not delivered to the mortgagee by the insurer, that failure does not result in coverage for an indefinite term, where no renewal premium is paid. Rather, coverage is extended to a mortgagee for a period of twenty days from the date the mortgagee had actual knowledge of termination. In this case, plaintiff had actual knowledge the policy lapsed by April 6, 1978; therefore, coverage expired no later than April 27, 1978.

9.

The Yorks' policy was validly terminated due to plaintiff's failure to pay the renewal premium. Therefore, their house was not insured at the time of the flood loss, and plaintiff's claim is dismissed.

Let judgment be entered accordingly.