G. Frank **QUESADA** and Rosa A. Quesada, his wife, Plaintiffs,

v.

**DIRECTOR, FEDERAL EMERGENCY MANAGEMENT AGENCY, a United States Agency, and State Farm Fire and Casualty Company, an Illinois Corporation, Defendants.**

No. 82–1658–Civ.–SMA.

United States District Court, S.D. Florida.

Dec. 29, 1983.

G. Frank Quesada, Coral Gables, Fla., for plaintiffs.

Ira F. Gropper, Asst. U.S. Atty., Miami Fla., Wayne W. Pomeroy, Fort Lauderdale, Fla., for defendants.

## MEMORANDUM OPINION CONTAINING FINDINGS OF FACT AND CONCLUSIONS OF LAW

ARONOVITZ, District Judge.

THIS CAUSE WAS TRIED TO THE COURT on Wednesday, November 2, 1983, in a non-jury trial during which testimony was adduced, exhibits were received and oral argument heard. This MEMORANDUM OPINION contains the Court's Findings of Fact and Conclusions of Law thereon.

Plaintiffs G. FRANK QUESADA and ROSA A. QUESADA, his wife, claim property damage [insurance covered] loss to their residence, at 3625 S.W. 130th Avenue, Miami, Dade County, Florida, in the sum of nineteen-thousand, five-hundred thirty-six dollars and sixty-four cents ($19,536.64). Said loss occurred on or about August 18, 1981, and was caused by heavy flooding and rains attributable to the weather event known as "Tropical Storm Dennis," which passed through South Florida on that day. Plaintiffs were insured by Defendants, DIRECTOR, FEDERAL EMERGENCY MANAGEMENT AGENCY ("FEMA") and STATE FARM FIRE AND CASUALTY COMPANY ("STATE FARM"), under policies of, respectively, flood insurance and homeowners' insurance.

With respect to the FEMA policy, this Court's jurisdiction is founded upon the National Flood Insurance Act of 1968, as amended, 82 Stat. 583, 42 U.S.C. §§ 4001 *et seq.*, and pursuant to the insurance contract issued to Plaintiffs by FEMA. This action having "arisen under" an applicable federal law, the general federal jurisdictional provision of 28 U.S.C. § 1331 applies and it is therefore appropriate to apply federal law. See *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943); *Gibson v. Secretary of HUD*, 479 F.Supp. 3, 5 (M.D.Pa.1978). The STATE FARM policy, not having been issued under the federal statutes, is to be interpreted in accordance with Florida law.

Although these Defendants were brought into this Court in a single action arising out of a single occurrence, the merits of this case differ as to each Defendant, as does the language of their respective policies. Thus, the Court will address each policy separately.

## THE STATE FARM POLICY

As to the Defendant STATE FARM, the Court finds that the subject homeowners' policy was not intended to cover, and does not protect Plaintiffs against, losses of the type sustained by Plaintiffs' home in this case. The clear language of the policy specifically *excludes* damage caused by flood and related events. Section One, page 7, ¶ 3 of the STATE FARM policy provides:

EXCLUSIONS ... We do not cover loss resulting directly or indirectly from: ...

3. Water damage, meaning:

a. flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;

b. water which backs up through sewers or drains; or

c. natural water below the surface of the ground, including water which exerts pressure on, or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

■ With regard to the interpretation of the STATE FARM policy, Florida law controls where, as here, jurisdiction is premised upon diversity, the damaged property (the residence) is within the state, the alleged breach and damage occurred within the state, the Plaintiffs are state residents, and the Defendant is a foreign corporation authorized to do business, and doing business, within the state. See *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

■ Under Florida law, when the terms of a contract are unambiguous, the Court is bound to give the language therein its plain and ordinary meaning. *Equitable Life Assurance Society of the United States v. Pinon*, 344 So.2d 880 (Fla. 3d DCA 1977). In such a case, contract construction is a matter of law for the Court to decide. *Smith v. State Farm Mutual Automobile Ins. Co.*, 231 So.2d 193 (Fla.1970). In interpreting the words of a clearly-worded contract, the Court may not add or subtract language from the face of the instrument, see *Emmco Ins. Co. v. Southern Terminal and Transport Co.*, 333 So.2d 80 (Fla. 1st DCA 1976), and may not make a new contract for the parties where their intent can be easily inferred from the contract itself. *Jefferson Ins. Co. v. Fischer*, 166 So.2d 129 (Fla.1964).

■ In the case at bar, the plain meaning of the STATE FARM contract gives rise to the undeniable inference that flood or flood-related damage was not within the ambit of the coverage contemplated by the parties. As to Defendant STATE FARM, therefore, the Court finds no liability to Plaintiffs.

## THE FEMA POLICY

The Court finds Defendant FEMA liable to Plaintiffs for the full amount of the proven damages to Plaintiffs' home, less the two-hundred dollars ($200) policy deductible.

Earlier in this litigation, FEMA had moved for summary judgment, asserting that Plaintiffs had not filed a proof of loss within sixty days of the event causing the damage, as required by the policy. See FEMA Policy, "General Conditions and Provisions," ¶ N. The Court DENIED FEMA's Motion. See Order Denying Defendant FEMA's Motion for Summary Judgment (file docket entry no. 58). For the reasons articulated in that Order, the Court again denies the Motion, which was renewed *ore tenus* during and at the close of the trial. Additionally, the Court reiterates its ruling that under the circumstances of this case, Plaintiffs' failure to file a proof of loss is *not* fatal to Plaintiffs' claim. See *Meister Bros., Inc. v. Macy*, 674 F.2d 1174 (7th Cir.1982); *Dempsey v. Director, FEMA*, 549 F.Supp. 1334 (E.D.Ark. 1982). These cases, and those cited therein, hold that failure to file a proof of loss does not *per se* bar an action on the policy where, as here, the claimant can show that he was affirmatively misled into thinking the filing was. unnecessary by the conduct of a claims adjuster, where there is no prejudice to the insurer, and where it can be inferred that the insurer was otherwise on notice of the claim and of the information that *would* have appeared in a proof of loss. See *Pavone v. Secretary of HUD*, 1982 Fire & Casualty Cas. 1477 (D.Conn. 1982); *Beck v. Director, FEMA*, 1982 Fire & Casualty Cas. 483 (N.D.Ohio 1981); *Del Boring Tire Serv. v. FEMA*, 496 F.Supp. 616 (W.D.Pa.1980); *Jackson v. National Flood Insurers Ass'n*, 398 F.Supp. 1383 (S.D.Tex.1974).

■ In the case at bar, an insurance adjuster was sent by FEMA to the Plaintiffs' residence just two days after the flood, and after thoroughly examining the home, the adjuster submitted a full report of the damage to FEMA. Subsequently, a technical advisor from the National Flood Insurance Program also inspected Plaintiffs' house. Moreover, FEMA sent a letter denying liability ON THE MERITS to Plaintiffs, on September 10, 1981, *before* the expiration of the sixty-day period during which Plaintiffs were supposed to file the proof of loss. It can be inferred, and reasonably was so by Plaintiffs, that FEMA had determined that no further information, contained in a proof of loss or otherwise, was required by the agency for its consideration and denial of Plaintiffs' claim. Plaintiffs' Notice of Loss, filed on August 20, 1981, itself contained virtually all of the information which would have been filed in a proof of loss, with the exception of a sworn notarization. Under these facts and circumstances, it would be inequitable and unfair to preclude Plaintiffs from claiming a loss under the FEMA policy, where the agency itself can be deemed to have constructively waived, and, by its actions, should be affirmatively estopped from asserting, this formal requirement through the actions of its agents and employees.

■ The Court finds, further, that the FEMA policy does cover, and was intended to cover, the particular loss sustained by Plaintiffs herein. This is not to say, and the Court does not hold, that every incident of flood-related damages is covered by the policy. Rather, the facts peculiar and attendant to this case bring it within the scope of policy coverage. The proximate cause of the damage to Plaintiffs' residence was the flooding of the area surrounding and immediately underneath the structure, which flooding resulted from Tropical Storm Dennis having passed through and having inundated South Florida on August 18, 1981 with torrential downpours and heavy gusts of wind. See M. Lawrence and J. Pelissier, "Atlantic Hurricane Season of 1981," Monthly Weather Review, vol. 110, no. 7 at 858–859 (July 1982) ("Hurricane Dennis ... centered over east-central Florida on 18 August. Some of the most intense convective clouds [were] located over extreme South Florida, where a 24 h[our] rainfall total of 390 [millimeters] was measured in Dade County on 18 August ...") (Plaintiff's Exhibit 13). Additionally, claims adjuster Carlos de la Torre, who examined the premises for FEMA, reported as follows:

Origin: On 8/18/81 as a result of Tropical Storm Dennis, this area in which the insured resides which is a semi rural area, was completely flooded and the general condition did in fact exist. Even on 8/19/81, the area was completely inaccessible. There is evidence that water rose in this area, a good two to three feet from the street level. All neighbors around the insureds, especially the ones that were sitting lower, received 18 inches of water throughout their homes.

(Plaintiffs' Exhibit 4) (Admitted at trial with respect to Defendant FEMA only).

Given that the proximate cause of the damage was unquestionably flooding, the language of the policy which covers "the insured against all DIRECT LOSS BY FLOOD" applies to the instant situation. Were the policy held not to apply, the Court would be hard-pressed to conceive reasonably of a circumstance in which the policy would cover what it plainly appears to cover.

The FEMA policy defines "flood" as follows:

> Wherever in this policy the term "flood" occurs, it shall be held to mean

A. A general and temporary condition of partial or complete inundation of normally dry land areas from:

1. The overflow of inland or tidal waters;

2. *The unusual and rapid accumulation or runoff of surface waters from any source;*

3. Mudslide (i.e., mudflow), a river or flow of liquid mud proximately caused by flooding as defined in subparagraph A–2 above or by the accumulation of water under the ground.

B. The collapse or subsidence of land along the shore of a lake or other body of water as a result of erosion or undermining caused by waves or currents of water exceeding the anticipated cyclical levels.

(Emphasis supplied).

If the quoted paragraph were itself the whole policy, there would appear to have been little need for a lawsuit on these facts; the occurrence at the Quesadas' house on August 18, 1981, was unquestionably attended by an unusual and rapid accumulation of waters both above and below the surface of their property. However, FEMA has made much of one of the exclusion clauses in the policy, which reads as follows, in relevant part:

> The insurer shall not be liable for loss:
> D. By theft or by fire, windstorm, explosion, earthquake, landslide or any other earth movement except such mudslide or erosion as is covered under the peril of flood; . . .

On cross-examination, FEMA elicited from the insurance adjuster that the damage resulted, not from the flood *per se*, but from extremely quick or rapid "settlement" of the ground which would *not* have occurred absent the flood. This does not change in any way the fact that a "general condition of flooding," attributable to Tropical Storm Dennis, was the direct, proximate and immediate cause of the damage to the house.[1] See Adjuster's Report, Plaintiffs' Exhibit 4. While the level of rising water did not reach so high as to enter the inside of Plaintiffs' home other than marginally, the foundation and ground underneath Plaintiffs' residence were thoroughly soaked and inundated. It is somewhat ironic that FEMA has argued that because the water flooded the neighbors homes at depths of approximately a foot-and-a-half, but did not enter the Quesadas' home *per se*, that the damage to Plaintiffs' house was less a result of the flooding conditions in the neighborhood. In fact, had the Quesadas' house been built lower to the ground, as some of the neighbors' homes were, the Quesadas would like-

---

1. For this reason and the reasons articulated throughout this opinion, the Court finds that the other policy exclusions are also inapplicable. Exclusion A(2), for example, would except the policy from coverage due to freezing, thawing or water pressure *unless* "the property covered has been simultaneously damaged by flood."

ly have suffered substantially more damage for which FEMA would ultimately have been liable under the policy. The damage occurred and became apparent immediately, and there was no dispute in the facts concerning Plaintiffs' having become immediately aware of the cracks and leaks in their house, of their immediately photographing same, and of their immediate notification to the insurance company. Independent insurance adjuster Carlos de la Torre, who assessed the claim for FEMA, testified that all of the damage occurred on August 18, 1981, well before the grounds had dried and before the water had started to recede. See also Adjuster's Report, Plaintiffs' Exhibit 4 (Admitted at trial with respect to Defendant FEMA only). There is no question that this was an extremely rapid event directly associated with and caused by the flood.

FEMA has argued that the case at bar is similar to, and should be controlled by, the Fifth Circuit's decision in *West v. Harris*, 573 F.2d 873 (5th Cir.1978). While the *West* case dealt with a similar, though not identical, flood insurance contract, a materially different set of circumstances attends the case at bar, distinguishing it from *West*. Since FEMA has relied substantially on *West*, the Court will set forth in some detail the factors differentiating *West* from the instant matter.

The *West* decision encompassed two separate cases, the Daigle case and the West case, each of which were addressed separately. In the Daigle case, the Fifth Circuit held the insurer not liable for damages where: (1) the house had a slab foundation built on reclaimed swampland, on soil which expands when wet and contracts when dry; (2) the soil movements cause houses built on such slabs to heave and settle slightly with moisture changes; (3) plaintiffs had occasionally found it necessary to purchase dirt fill for the repair of "pot holes" which appeared on their land from time to time; (4) the water never got closer to plaintiffs' home than a point approximately halfway to the house from the street; (5) the county kept water in the drainage canals in the area surrounding plaintiffs' home, in order to maintain the water table and stabilize the soil, but on the occasion in question the soil became supersaturated and the house heaved and rose; and (6) the canals were quickly drained to minimize supersaturation, which rapidly dried the soil and caused the cracking, settling and other damage to plaintiffs' home. 573 F.2d at 876–77. These unique circumstances led the Court of Appeals to conclude that the damage to the Daigles' house was caused by "earth movement other than a mudslide," and was thus excluded from the policy coverage. As noted by the Court, "The [Daigles'] house sank because the earth below it shifted and settled as a result of loss of moisture in the soil." Id. at 877. Similarly, in the West case, the Court found that the Wests' house, "[like the Daigles',] was built on reclaimed swampland and was supported by a clay-humus mixture soil foundation that would expand and contract with soil moisture changes." Id. at 878.

In the case at bar, unlike those of the Wests and the Daigles, the Plaintiffs' home was built not on reclaimed swampland, but over sand—the customary fill used in housing foundations in Dade County. There was no evidence adduced that sand expands and contracts the way the reclaimed swampland, filled in with a mixture of humus and clay, did in the *West* cases. Similarly, no evidence was introduced in support of the notion that sand would cause the kind of "heaving and settling" with moisture changes that occurred in *West*. The Quesadas had never found it necessary to purchase fill for the types of "potholes" found on the land of the Daigles and Wests. Additionally, there was no immediate drainage, and no immediate drying of the land surrounding the Quesadas' residence, as occurred when the drainage canals in *West* were quickly emptied. Finally, although the water never entered the Quesadas' house directly, there was evidence adduced at trial that water had come all the way up to the house and under it into its foundation.

■ The differences between the *West* case and the case at bar are significant because they stem from the heart of what the Fifth Circuit held in *West:* that the flood insurance policy issued to plaintiffs under the National Flood Insurance Act of 1968 does not cover damage which was "the result of earth movement," where such movement would have occurred over time *regardless* of the flooding, or where the movement was in some sense uniquely attributable to the particular structure of the insured's house as compared with others in the locality. In *West*, it is apparent that the flood and the draining of the canals accelerated a process that was already taking place, e.g., the shifting or "heaving" of the reclaimed swampland and clay-humus fill under the plaintiffs' houses. In the case at bar, no evidence was offered by any party suggesting that the Plaintiffs' house would have "rapidly settled" absent the flooding. Tropical Storm Dennis created a flood damage situation that did not and would not have existed otherwise. There was no drying, no draining of canals, no condition peculiar to Plaintiffs' house or grounds,[2] and no activity of any person that had any effect on the house above or beyond the flood itself. It would be unreasonable under the specific facts adduced in this case, on this evidence, to find that anything other than the flood caused the damage to Plaintiffs' house. Based on the plain language of the FEMA insurance policy, the Plaintiffs had every right to believe and understand that they were covered by its explicit terms. This Court simply will not and cannot find that a "STANDARD FLOOD INSURANCE POLICY" does not protect the insured against damages proximately, directly and immediately caused by a flood from a tropical rainstorm. To the contrary, this Court finds that on August 18, 1981, a general condition of flooding existed in Plaintiffs' neighborhood, precipitated by Tropical Storm Dennis, which proximately and directly caused the damage to Plaintiffs' house within the plain meaning of the FEMA flood insurance policy's coverage.

The Court must also point out that some time has elapsed since the policy in question in *West* was issued. That policy was the 1973 version, id. at 876, of a policy which has undergone some broadening since that time. For example, it will be noted that in the *West* cases, the "Perils Excluded" provision read as follows:

> This company shall not be liable for loss: … (D) by fire, windstorm, explosion, erosion, earthquake, landslide or any other earth movement except such mudslides as are covered under the peril of flood …

Thus, under the 1973 policy, *erosion* was specifically excluded from coverage. However, in the Quesadas' policy, issued in 1980, erosion is *covered* as follows:

> The insurer shall not be liable for loss: … (D) by theft or by fire, windstorm, explosion, earthquake, landslide or any other earth movement *except* such mudslide or *erosion* as is covered under the peril of flood…

(Emphasis added).

The Court does not, of course, find that the damage to the Quesadas' house was caused by erosion. However, it seems clear from the revision in the policy that coverage was intended to have expanded to include earth movements such as erosion, which was formerly excluded. Such broadening in scope can perhaps best be understood in relation to the intent of Congress, which is set forth in the very first section of the National Flood Insurance Act, 42 U.S.C. § 4001, which reads as follows:

> § 4001. *Congressional findings and declaration of purpose*
>
> Necessity and reasons for flood insurance program
>
> (a) The Congress finds that (1) from time to time flood disasters have created per-

---

**2.** For this reason, Exclusion A(3) of the FEMA policy is inapplicable to the Quesadas' case. That exclusion would exempt FEMA from coverage where the flooding or other injurious event caused the damage through design defects or other problems peculiar to the property of the insured.

sonal hardships and economic distress which have required unforeseen disaster relief measures and have placed an increasing burden on the Nation's Resources; (2) despite the installation of preventive and protective works and the adoption of other public programs designed to reduce losses caused by flood damage, these methods have not been sufficient to protect adequately against growing exposure to future flood losses; (3) as a matter of national policy, a reasonable method of sharing the risk of flood losses is through a program of flood insurance which can complement and encourage preventive and protective measures; and (4) if such a program is initiated and carried out gradually, *it can be expanded as knowledge is gained and experience is appraised, thus eventually making flood insurance coverage available on reasonable terms and conditions to people who have need for such protection.*

Id. (Emphasis added).

Thus, the National Flood Insurance Program was not intended to be a static, never-changing concept; instead, as is apparent from 42 U.S.C. § 4001(a)(4), the Program was intended and designed to respond flexibly to the reasonable needs of those for whose protection the Program, and the insurance policies issued under it, were addressed. One way in which the Program has manifest its ability to continually adjust to newly-understood situations is, as noted above, the broadening of the policies to include certain types of erosion that had been formerly excluded therefrom. Given Congress's intent that the National Flood Insurance Program be fluid and adaptable, it cannot be said that the *West* decision, which construed a 1973 policy, is necessarily binding in a case involving a more recent policy under materially distinguishable circumstances. Moreover, under the facts and evidence now before

the Court, *West* cannot be said to preclude liability where flood is the direct, proximate and immediate cause of damage to a dwelling, whether by the force of water against the oriental rugs inside the house or its effect on the land, the foundation, and the walls of the structure itself. While FEMA might have offered evidence that other factors such as settlement or compaction would have caused the damage regardless of the flood, over a period of time, FEMA offered no such evidence, and certainly nothing to contradict the testimony of Plaintiffs' witnesses, who were fully credible. The evidence this Court accepts is, simply, that flooding was the direct, proximate and necessary cause of the August 18, 1981 damage to Plaintiffs' home.

## THE AMOUNT OF DAMAGES

■ Plaintiffs have claimed damages totalling $19,536.64. This total would include monies spent for such work as carpentry, tiling, re-painting and other rebuilding necessitated by the flood damage covered by the terms of the FEMA policy. The amounts substantiated by cancelled checks, bills and credible testimony include the following:

| Payment to: | Amount |
|---|---|
| Walter Lista | $7,500.00 |
| Humberto Basulta | 3,270.00 |
| Rainbow Tile | 2,187.53 |
| Lozana Enterprises | 2,432.00 |
| Guillen's Plumbing | 354.26 |
| D & B Tile | 222.56 |
| Sherwinn Williams | 220.29 |
| J.M. Garcia, Inc.* | 2,950.00 * |
| TOTAL | $19,236.64 * |

A $200.00 deductible under the FEMA policy renders Plaintiffs' total recovery equivalent to nineteen thousand, thirty-six dollars and sixty-four cents ($19,036.64). A Final Judgment in that amount shall be rendered by the Court in a separate Order, of even date herewith.

* Plaintiffs had requested $3,250.00 in damages to cover payments made to J.M. Garcia, Inc. However, this amount was substantiated at trial only to the extent of $2,950.00. There was some discrepancy in the testimony regarding the additional $300.00. Since Plaintiffs bear the burden of proof as to damages, the Court has awarded them only the amount proven, i.e., $2,950.00 paid to J.M. Garcia, Inc., and $19,236.64 total, minus the $200.00 policy deductible.

THE FOREGOING shall constitute this Court's FINDINGS OF FACT and CONCLUSIONS OF LAW.

### FINAL JUDGMENT

THIS CAUSE was tried to the Court in a non-jury trial on Wednesday, November 2, 1983, at which testimony was adduced, exhibits received and oral argument presented. A decision having been rendered as is set forth more fully in this Court's MEMORANDUM OPINION CONTAINING FINDINGS OF FACT AND CONCLUSIONS OF LAW, entered of even date herewith, it is thereupon

ORDERED AND ADJUDGED as follows:

1. FINAL JUDGMENT is hereby entered in favor of Plaintiffs G. FRANK QUESADA and ROSA A. QUESADA, his wife, and against Defendant DIRECTOR, FEDERAL EMERGENCY MANAGEMENT AGENCY, in the amount of nineteen thousand, thirty-six dollars and sixty-four cents ($19,036.64). Plaintiffs shall recover costs of action, to be taxed by the Clerk of this Court, upon submission of Bill of Costs form and appropriate supporting affidavits.

2. FINAL JUDGMENT is hereby entered in favor of Defendant STATE FARM FIRE AND CASUALTY COMPANY, and against Plaintiffs, each party to bear its own costs. From Defendant STATE FARM FIRE AND CASUALTY COMPANY, Plaintiffs shall take nothing on their action and this Defendant is hereby dismissed and shall go hence without day.