753 F.2d 1011
 G. Frank QUESADA, Rosa A. Quesada, his wife, Plaintiffs-Appellees,
v.
DIRECTOR, FEDERAL EMERGENCY MANAGEMENT AGENCY, a United
States Agency, Defendant-Appellant,
State Farm Fire and Casualty Co., an Illinois corporation, Defendant.
 No. 84-5129.
 United States Court of Appeals,
Eleventh Circuit.
 Feb. 22, 1985.
 
 Judy K. Hunt, Asst. U.S. Atty., Miami, Fla., for defendant-appellant.
 G. Frank Quesada, Coral Gables, Fla., pro se.
 Miller Walton, Sally R. Doerner, Miami, Fla., for State Farm.
 Appeal from the United States District Court for the Southern District of Florida.
 Before TJOFLAT and FAY, Circuit Judges, and ALLGOOD*, District Judge.
 PER CURIAM:
 
 
 1
 This is an appeal by the Federal Emergency Management Agency (FEMA)[1] from an adverse judgment in favor of the plaintiffs G. Frank and Rosa A. Quesada (the Quesadas). The trial court found that FEMA's flood insurance policy covered the damage sustained to the Quesadas' home as a result of tropical storm "Dennis". Quesada v. Director, Federal Emergency Management Agency, 577 F.Supp. 695 (S.D.Fla.1983). We affirm.
 
 I. BACKGROUND
 
 2
 There is no real dispute over the facts. On August 18, 1981, tropical storm Dennis passed through Florida, causing exceptionally heavy rainfall. It is undisputed that there was flooding in the area surrounding the Quesadas' home. It is also undisputed that no water actually entered the interior of the Quesadas' home. Rather, their home sustained damage due to the settling or compacting of the fill underneath the foundation of their home, which occurred as a result of the saturation of the fill by the water from the storm. When the saturated fill compacted, the floor slab underneath the Quesadas' home shifted, causing extensive cracking of the floors and walls.
 
 
 3
 The Quesadas had a flood insurance policy with FEMA. The pertinent provisions of that policy provide as follows:
 
 
 4
 DEFINITION OF "FLOOD"
 
 
 5
 Wherever in this policy the term "flood" occurs, it shall be held to mean:
 
 
 6
 A. A general and temporary condition of partial or complete inundation of normally dry land areas from:
 
 
 7
 1. The overflow of inland or tidal waters.
 
 
 8
 2. The unusual and rapid accumulation or runoff of surface waters from any source.
 
 
 9
 3. Mudslide (i.e. mudflow), a river of flow of liquid mud proximately caused by flooding as defined in subparagraph A-2 above or by the accumulation of water under the ground.
 
 
 10
 B. The collapse or subsidence of land along the shore of a lake or other body of water as a result of erosion or undermining caused by waves or currents of water exceeding the anticipated cyclical levels.
 
 Perils Excluded:
 
 11
 The insurer shall not be liable for loss; ...
 
 
 12
 d. By theft or by fire, windstorm, explosion, earthquake, landslide or any other earth movement such as mudslide or erosion as is covered under the Peril of flood.
 
 
 13
 R.Vol. 1 at 4.
 
 
 14
 The policy issued to plaintiffs was the result of a federally subsidized program, which was designed to provide flood insurance at an affordable price. The program was established by the National Flood Insurance Act of 1968, 42 U.S.C. Secs. 4001-4127, which is now administered by FEMA.[2]
 
 
 15
 The claims adjuster for FEMA testified that he saw fresh looking cracks inside the house during an inspection of appellees' home two days after the storm. Appellees' expert testified that appellees' house was built on sand fill above limerock; such sand fill being the material commonly used for the construction of houses in this area. He also explained that if the house had been built improperly, then this type of structural damage would have occurred prior to the storm. The house was approximately four years old. In assessing appellees' evidence, the district court stated that "[t]here is no question that this [the damage to appellees' home] was an extremely rapid event directly associated with and caused by the flood." 577 F.Supp. at 700.[3]
 
 
 16
 On cross-examination, appellees' expert acknowledged that it was the compaction of the soil, not the water itself, which was the immediate cause of the damage to appellees' home. That is, the sudden and total saturation of the sand fill beneath appellees' home by the flood waters from the tropical storm caused the compaction of that fill which caused the damage incurred by appellees.
 
 II. THE LAW
 
 17
 Appellant makes two arguments in support of denial of coverage: first, that the definition of "flood" in this policy does not cover the instant situation, and second, that the "earth movement" exclusion applies. The district court concluded that the policy's definition of flood did cover the facts presented here and that the exclusion was not applicable. We agree.
 
 
 18
 As to the first argument, FEMA basically contends that the flood water must actually inundate the home in order for there to be coverage. That is, a predicate for coverage is that the water must physically enter the house. In our view, this position is untenable and flies in the face of the clear language of the policy. There is no question that the water produced by the tropical storm thoroughly "inundated," to use appellant's terminology, the foundation of appellees' home. We discern no sound reason why coverage should be denied solely because the water did not rise so high as to actually enter the living area of appellees' home. See Gibson v. Secretary of U.S. Department of Housing & Urban Development, 479 F.Supp. 3 (M.D.Pa.1978) (loss proximately caused by flood even though flood water did not actually enter insured's home).
 
 
 19
 In support of its second argument, that the "earth movement" exclusion applies,[4] appellant urges us to follow West v. Harris, 573 F.2d 873 (5th Cir.1978), cert. denied, 440 U.S. 946, 99 S.Ct. 1424, 59 L.Ed.2d 635 (1979). Though we agree that the West case is facially similar to the instant case, we also agree with the district court that it is factually distinguishable in several significant respects. First and most importantly, in both cases encompassed in the West decision,[5] the houses were built on reclaimed swampland, which was supported by a soil which expanded and contracted with normal changes in the soil moisture. The evidence in West showed that those "soil movements cause[d] houses built on slabs to heave and settle slightly with soil moisture changes." 573 F.2d at 876. There was clear evidence that damage to these houses would probably have occurred regardless of any flood. In contrast, there is no evidence in the instant case that the soil underneath appellees' home was susceptible to any such compaction due to normal moisture fluctuations. The Quesadas' expert testified that had the house been built on an improper foundation, the cracking of the walls and floors would have occurred sooner. Second, as the trial court noted, in one of the West claims, the water had never actually reached the insured's home. 573 F.2d at 876. In this matter, all agree that the water from tropical storm Dennis actually rose to within inches of the concrete slab and completely saturated the fill constituting the foundation of appellees' home. In sum, we agree with the district court that "the flood and the draining of the canals [in West ] accelerated a process that was already taking place, e.g., the shifting or 'heaving' of the reclaimed swampland and clay-humus fill under the plaintiffs' houses." Quesada, 577 F.Supp. at 701 (emphasis added). No such condition was present in the Quesada home.
 
 
 20
 We note additionally, as did the district court, that since West was decided, the flood insurance policy issued by FEMA has undergone some broadening of coverage. As an example, these policies now cover loss due to erosion as caused by flooding, whereas erosion was specifically excluded from coverage in earlier versions. Because of the unique circumstances present in West, it does not control the disposition of the instant case.
 
 
 21
 The government's contention that the "earth movement" exclusion precludes recovery is really grounded on a very strained proximate cause theory, to wit, the nearest and most immediate "cause" of the damage was the compaction of the soil beneath appellees' home. Though in the most literal sense this may be true, we can not ignore the uncontradicted fact that the compaction would not have occurred but for the flooding[6] and did in fact occur simultaneously therewith. If we deny coverage in this factual situation, we are hard pressed to imagine a scenario, other than the actual washing away of a house, where coverage would exist.[7]
 
 
 22
 Because we conclude that the definition of "flood" in the Quesadas' flood insurance policy covers the factual situation presented here and that the "earth movement" exclusion is not applicable, the district court's judgment is AFFIRMED.
 
 TJOFLAT, Circuit Judge, dissenting:
 
 23
 In 1968, the Congress passed the National Flood Insurance Act, establishing a federally subsidized program to provide flood insurance to American citizens at an affordable price. Congress took this action because private insurance companies were unable to write flood insurance policies on an economically feasible basis and something had to be done to alleviate some of the extreme hardships suffered by flood victims. The insurance policy the Federal Emergency Management Agency (FEMA) issued Frank and Rosa Quesada was the standard flood insurance policy provided by this program.
 
 
 24
 I am compelled to dissent in this case for two reasons. First, the majority's interpretation of FEMA's standard policy affords much wider coverage than is contemplated by the National Flood Insurance Program FEMA administers and could result in premiums beyond the pocketbooks of many of our citizens the program was designed to reach. The majority has expanded the policy's coverage by eliminating the policy exclusion which precludes coverage when the insured's loss is caused, as it was here, by earth movement. Second, this panel is bound by Fifth Circuit precedent, Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc) (this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981), to apply this policy exclusion on the facts presented in this case and to deny coverage. See West v. Harris, 573 F.2d 873 (5th Cir.1978), cert. denied, 440 U.S. 946, 99 S.Ct. 1424, 59 L.Ed.2d 635 (1979).
 
 
 25
 The Quesadas purchased their home in October 1980 and promptly made application for, and were issued, a standard flood insurance policy. The Quesadas' home was typical of many South Florida residences. It had been constructed on a concrete slab, which rested on sand fill dirt; the fill was five feet deep. The outside walls were of concrete block and rested on footings which were independent of the slab. The residence was apparently in good condition, except for a crack along the extension wall of the front of the home, where the porch met the front wall, and a crack in the swimming pool located in the back yard.
 
 
 26
 In August 1981, Tropical Storm Dennis passed through South Florida, causing heavy rain. There was flooding in the Quesadas' neighborhood and some homes were inundated. The Quesadas' home, which, having been constructed five feet above the normal grade, was more elevated than the others, was not. The water level came to within ten to fifteen feet of the front of the home and about twenty feet from the rear, but it did not enter the dwelling.
 
 
 27
 During the storm, underground water rose to within a foot or so of the concrete slab beneath the Quesadas' house and saturated the fill on which it had been constructed. After the storm, when the surface water in the neighborhood receded, the saturated fill compacted and moved downward, thus depriving the slab of support. As a result, the slab also moved downward and caused some cracking in the floors and walls of the house. In the process, the preexisting crack along the front wall enlarged.
 
 
 28
 It is not necessary to decide whether the damages the Quesadas sustained were the result of a "complete inundation," and thus a flood as defined in the policy, because the "earth movement" policy exclusion is dispositive of this appeal. That exclusion states that:
 
 The insurer shall not be liable for loss:
 
 29
 D. By ... earthquake, landslide or any other earth movement except such mudslide or erosion as is covered under the peril of flood.
 
 
 30
 (Emphasis added.) This exclusion applies, as the Fifth Circuit unambiguously held in West v. Harris, even though the insured's residence may have been flooded. The Quesadas admit that the damage their home sustained, cracking of walls and floors, occurred because the earth beneath its slab settled. To be sure, heavy rains accumulated around the residence and water seeped into and saturated the soil, causing the earth to consolidate. But the fact remains that the damage was caused by earth movement.
 
 
 31
 In West our former circuit was faced with two identical cases, both involving houses built on concrete slabs. There we held that when earth movement is the immediate cause of the damage, even when flooding inundates the home, the exclusion applies. There, as here, heavy rainfall caused flooding in the area immediately adjacent to and surrounding the two residences; in fact, the flood water actually entered one of them. The soil under and around the insured structures became saturated; when the water receded, the soil dried, the slabs shifted, and the walls cracked. This is precisely what occurred in this case. To say, as the majority has, that West is inapposite is pure sophistry.
 
 
 32
 The West panel's words could not be more apposite:
 
 
 33
 Regardless of the role the flood of April 17-18 played in bringing about the conditions that led to the damage ... the immediate cause of the damage was the settlement of the house due to uneven soil support. The house sank because the earth below it shifted and settled as a result of loss of moisture in the soil. Regardless of whether this settlement had been in process over a long period of time or whether it occurred immediately after the flood ... it was still the result of earth movement....
 
 
 34
 ....
 
 
 35
 The policy does not cover loss caused by earth movement in the form of soil settlement. It unambiguously provides that the only earth movement covered is a mudslide caused or precipitated by accumulation of water on or under the ground.
 
 
 36
 (Emphasis in original.) 573 F.2d at 877.
 
 
 37
 The majority says that West is distinguishable because the homes there were built on reclaimed swamp land. I fail to comprehend any basis for distinguishing between sand fill and muck (or, for that matter, any other soil), and nothing in the West opinion suggests that such a distinction can, or should, be made. There was no finding in West that the damage was caused by some preexisting condition in the supporting soil; to the contrary, the finding was that the saturation of the supporting soil, followed by the lowering of the water level, caused the damage.
 
 
 38
 In sum, we are bound by West until this court, sitting en banc, decides otherwise. I would, accordingly, reverse the district court and direct it to enter judgment for FEMA.
 
 
 
 *
 Honorable Clarence W. Allgood, U.S. District Judge for the Northern District of Alabama, sitting by designation
 
 
 [1]
 State Farm Fire & Casualty Company was a party-defendant in the trial court. Judgment was entered in favor of State Farm, and no appeal was taken. Therefore, State Farm is no longer a party to this suit
 
 
 [2]
 For a discussion of the program, see Beverly v. Macy, 702 F.2d 931, 932-34 (11th Cir.1983). At oral argument, the government asserted that the policy's coverage was intended to be limited in scope. We conclude that denial of coverage in this factual context would unduly limit coverage to an extremely narrow class of situations, in contravention with the congressional intent. See infra note 7
 
 
 [3]
 Noting that the government had not presented any evidence to contradict appellees' evidence that "the area in which [their] house was located, including the very lot on which it was situated ... [was] the subject of flood waters[ ]," the trial court stated that "I am starting from that premise, that it has been established that this was a general flooding of the area." (T. at 281)
 
 
 [4]
 Of course, all exclusions will be "strictly construed against the insurer and in favor of coverage." Smith v. Horace Mann Ins. Co., 713 F.2d 674, 676 (11th Cir.1983)
 
 
 [5]
 The West decision involved two separate cases, the Daigle case and the West case. Both involved substantially the same insurance policy as is involved in the instant case, and, in both cases, the insureds' houses were built on reclaimed swampland. 573 F.2d at 876-78
 
 
 [6]
 A similar proximate cause argument was raised in Atlas Pallet, Inc. v. Gallagher, 725 F.2d 131 (1st Cir.1984), where the court denied coverage, based on the following scenario. The Clear River had flooded, which caused the milldam to collapse, which then rendered insured's sprinkler system inoperative. The court held that the damage to the sprinkler system was not a "direct loss by flood." Id. at 137-38. In contrast, we conclude that the damage to appellees' home was directly attributable to the flooding which occurred as a result of tropical storm Dennis. We do not view the compaction of soil in the instant case as a form of "superseding cause", which is how the First Circuit apparently viewed the collapse of the milldam
 
 
 [7]
 Moreover, we are mindful that the stated congressional intent of this flood insurance program suggests that the program was designed to adapt to changing needs. The National Flood Insurance Act states:
 Sec. 4001. Congressional findings and declaration of purpose
 Necessity and reasons for flood insurance program
 (a) The Congress finds that ... (4) if such a program is initiated and carried out gradually, it can be expanded as knowledge is gained and experience is appraised, thus eventually making flood insurance coverage available on reasonable terms and conditions to persons who have need for such protection.
 42 U.S.C. Sec. 4001(a) (emphasis added).