**James HIDENFELTER and Mable Hidenfelter, Plaintiffs,**

v.

**DIRECTOR, FEDERAL EMERGENCY MANAGEMENT AGENCY, Defendant.**

**No. K81–396 CA.**

United States District Court,
W.D. Michigan, S.D.

March 6, 1985.

lake levels and wave action caused flooding of their property by the waters of Lake Michigan eroding the land that supported the foundation of their house to the point that the house is now uninhabitable. They seek insurance benefits in the amount of the face value of the policy claiming that the present condition of the house has resulted in compensable losses exceeding the policy limits.

The defendant in this action is the director of the Federal Emergency Management Agency (FEMA), the agency responsible for administering the National Flood Insurance Program. FEMA challenged plaintiffs' right to recover under the insurance policy on two grounds: first, that plaintiffs' have failed to satisfy a contractual prerequisite to bringing this suit by failing to submit a formal "proof of loss" within sixty days of the claimed loss; and, second, that the damage to plaintiffs' house was not the result of erosion caused by flooding as defined in the policy of insurance. In addition, FEMA argued that plaintiffs' had failed to mitigate their damages and that plaintiffs' suffered damages in an amount less than the face value of the insurance policy. As required by Fed. R.Civ.P. 52(a), the Court's findings of fact and conclusions of law are stated below.

Joseph W. Hayes, Stevens & Hayes, Coldwater, Mich., for plaintiffs.

Thomas J. Gezon, Chief Asst. U.S. Atty., Grand Rapids, Mich., for defendant.

## OPINION

BENJAMIN F. GIBSON, District Judge.

This case was tried without a jury before the Court in May of 1984. Plaintiffs brought this civil action to obtain benefits under a policy of flood insurance covering their house located on property along the shore of Lake Michigan. The flood insurance was obtained under provisions of the National Flood Insurance Act, 42 U.S.C. § 4001 et seq. Plaintiffs claim that high

## FINDINGS OF FACT

In 1966, plaintiffs purchased the property located at 38 Evergreen Bluff in South Haven Township, Michigan. At the time they purchased the property, their lot measured over 200 feet deep by 77 feet wide and sat on a bluff approximately 75 feet above Lake Michigan. The bluff itself was covered by vegetation and there was 30–40 feet of beach at the base of the bluff. Plaintiffs' house sat approximately 120 feet from the edge of the bluff and there was a three-story observation tower located between the house and the bluff.

When the National Flood Insurance Act was amended to provide coverage under the National Flood Insurance Program for losses caused by erosion due to flooding,

plaintiffs obtained coverage for the observation tower and their house. As of the date of the trial in this matter, plaintiffs were still participating in this federal flood insurance program.

Plaintiffs have made three claims under the National Flood Insurance Program. Their first claim was filed in 1975 when recession of the bluff as a result of erosion undermined the observation tower to the point that it was in imminent danger of falling over the bluff. At that time, plaintiffs contacted their insurance agent to file a claim. A notice of loss was submitted and an adjuster investigated the claim on behalf of the insurer. In January, 1976, shortly after plaintiffs signed a proof of loss that had been prepared and submitted to them by agents of the insurer, that claim was settled for $4000, the face amount of the policy on the observation tower.

Plaintiffs filed their second and third claims, which are the subject of this lawsuit, in October of 1976 and January of 1978 claiming that erosion had rendered the house uninhabitable. At the time of the October 26, 1976 claim, only a portion of the rear porch attached to the house had been undermined. However, by the time plaintiffs filed their claim in 1978, the foundation of the house itself had been undermined by erosion. Although plaintiffs submitted a notice of claim with respect to this loss, they never submitted a proof of loss.

In spite of never having received a proof of loss, defendant investigated plaintiffs' 1976 and 1978 claims. As stated in Defendant's Exhibit I, plaintiffs were advised that they would not receive payment for any loss associated with their claim in 1976 because there had been no physical damage to the dwelling. After plaintiffs' 1978 claim had been investigated, defendant offered a little over $200 in settlement of the claim concluding that the loss was limited to damages to the rear porch which had been severely undermined as a result of erosion. Sometime after July 7, 1978, almost seven months after plaintiffs filed their claim, a proof of loss for $200.79 was sent to plaintiffs for damage to the porch.

Plaintiffs did not accept the offer of $200.79 and did not sign and return the proof of loss. Defendants finally rejected plaintiffs' claim by a letter dated April 1, 1981.

The plaintiffs testified to the changes that occurred in the bluff from 1968 through 1978. During this period, the rate of erosion was substantially higher than that encountered by plaintiffs in prior years. Initially, the vegetation on the bluff was lost and attempts to replace the vegetation to slow the rate of soil loss proved futile. As the process continued, the bluff became undermined causing large portions to fall into the lake. It was as a result of this process that the observation deck was eventually undermined and fell into the lake and in 1978, a portion of the house became undermined. Experts for both parties related the high rate of erosion at the Hidenfelter property to high water levels on Lake Michigan during this period.

Water levels on Lake Michigan are affected by several factors. Storm activity, exclusive of wave action, can cause them to rise several feet in a matter of hours and wave action can cause even higher water levels to be achieved. While storms and wave action may rapidly and temporarily increase water levels on Lake Michigan, because of its immense size, lake water levels respond more slowly to increases in water volume attributable to precipitation, and stormwater runoff, or losses attributable to evaporation and water outflow.

Lake Michigan water levels also exhibit a seasonal cycle with low water levels occurring in late winter because precipitation is stored on land in the form of snow while high water levels occur in summer after the snow has melted and entered the lake as runoff. Lake levels also fluctuate over longer periods of time. Although some observers have postulated various multi-year cycles to explain long-term variations in lake levels, at this point no multi-year cycles of higher or lower than average water levels have been conclusively identified.

During the period from 1966 to 1974 average monthly water levels on Lake Michigan were generally rising with the highest water level ever recorded on Lake Michigan occurring in 1973. The evidence submitted during the trial demonstrated that from April, 1969 to December, 1976, the average monthly water levels on Lake Michigan were continuously above Lake Michigan's mean water level calculated for the period 1900 through 1983. *See* Defendant's Exhibits D and O. Beginning in late 1974 and running through 1978, average monthly water levels on Lake Michigan were generally declining. See Defendant's Exhibit D.

### CONCLUSIONS OF LAW

The National Flood Insurance Program was instituted pursuant to the National Flood Insurance Act, 42 U.S.C. § 4001 *et seq.*, to provide low cost flood insurance to homeowners and small businesses that may suffer losses through damage to real and personal property from flooding. Plaintiffs brought this lawsuit to recover benefits under a policy of flood insurance issued under the National Flood Insurance Program after their claim was rejected by FEMA. Jurisdiction over this civil action is provided by 42 U.S.C. § 4072.

The Standard Flood Insurance Policy issued to plaintiffs describes the requirements for filing a claim in Paragraph N which provides in part:

> *Requirements in Case of Loss* —The insured shall give written notice, as soon as practicable, to this Company of any loss.... Within 60 days after the loss, unless such time is extended in writing by this Company, the insured shall render to this Company a proof of loss, signed and sworn to by the insured, stating the knowledge and belief of the insured as to the following: the time and origin of the loss, the interest of the insured and of all others in the property, the actual cash value of each item thereof and the amount of loss thereto, all encumbrances thereon, all other contracts of insurance, whether valid or not, covering any of said property, any changes in the title, use, occupation, location, possession or exposures of said property since the issuing of this policy, by whom and for what purpose any building herein described and the several parts thereof were occupied at the time of loss.

Paragraph S of the Standard Flood Insurance Policy provides in relevant part:

> *Action Against the Company* —No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless all the requirements of this policy shall have been complied with, and unless commenced within 12 months next after the date of mailing of notice of disallowance or partial disallowance of the claim.

As of the date of the trial in this matter, plaintiffs had not filed a proof of loss as required by Paragraph N of the insurance contract. Defendant contends that their failure to do so is an absolute bar to this lawsuit while plaintiffs argue that the government should be estopped from asserting that the required proof of loss has not been filed.

■ Although as a general rule the government cannot be estopped by acts of its agents, *see e.g. Federal Crop Insurance Corporation v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947), *United States v. River Coal Co., Inc.,* 748 F.2d 1103, 1108 (6th Cir.1984), as the Sixth Circuit observed in *Rogers v. Tennessee Valley Authority,* 692 F.2d 35, 37 (6th Cir. 1982) "[t]he doctrine of equitable estoppel as applied to the government has undergone considerable development since *FCIC v. Merrill, supra.*" In several recent cases, the doctrine has been applied to prevent the government from unfairly asserting the failure to file a proof of loss as a defense to claims under flood insurance policies issued pursuant to the National Flood Insurance Act. *E.g. Meister Bros., Inc. v. Macy,* 674 F.2d 1174 (7th Cir.1982); *Quesada v. Director, Federal Emergency Management Agency,* 577 F.Supp. 695 (S.D.Fla.1983), *aff'd, Quesada v. Director,*

*Federal Emergency Management Agency,* 753 F.2d 1011 (11th Cir.1985) (*per curiam* with Tjoflat, J. dissenting); *Bolton v. Giuffrida,* 569 F.Supp. 30 (N.D.Cal.1983); *Dempsey v. Director, Federal Emergency Management Agency,* 549 F.Supp. 1334 (E.D.Ark.1982). *But see West Augusta Development Corp. v. Giuffrida,* 717 F.2d 139 (4th Cir.1983). Synthesizing the standards outlined in those cases, the Court concludes that the government may be estopped from denying that plaintiffs submitted the proof of loss required under the insurance policy if plaintiffs have demonstrated that they were affirmatively misled into thinking that the filing was unnecessary by agents of FEMA, there is no prejudice to the insurer, and the insurer was otherwise on notice of the claim and the information that would have been provided in the proof of loss. *See Quesada,* 577 F.Supp. at 698.

The record shows that plaintiffs made three claims under their flood insurance policies and in each case the same procedure was followed. The investigation of the claim began when plaintiffs submitted a notice of loss describing the nature of their claim. The insurer, either the National Flood Insurers Association or FEMA, would select an adjuster to investigate the claim and at the conclusion of the investigation, if the insurer decided to settle the claim, it would submit its proposed settlement in conjunction with a proof of loss for plaintiffs to sign. This procedure was followed when plaintiffs filed their claim for the loss of their observation tower in 1975 and resulted in plaintiffs' claim being settled for the face amount of the insurance policy. While plaintiffs' 1976 claim was denied in its entirety before the sixty-day period for filing the proof of loss had run, when plaintiffs filed their claim in 1978, agents for FEMA continued to process the claim and some time on or after July 10, 1978 sent a proof of loss in the amount of $200.79 to plaintiffs as a proposed settlement for their claim. Defendant's Exhibit G. Even though plaintiffs refused to accept and sign this proof of loss, FEMA did not deny plaintiffs' claim until April 1, 1981, and did so, not because of plaintiffs' failure to file the required proof of loss, but because FEMA had determined that the loss was not covered under the insurance policy. Defendant's Exhibit J.

■ It was only when this civil action was filed that FEMA raised the failure to file the proof of loss as a defense to plaintiffs' claim. Prior to that, FEMA had followed procedures indicating that plaintiffs need not submit a proof of loss and reinforced this impression by preparing and submitting a proof of loss to plaintiffs after the 60-day period had run. The Court concludes that under the circumstances of this case, FEMA's conduct affirmatively misled plaintiffs into believing that filing the proof of loss was unnecessary. The Court also finds that FEMA was not prejudiced by plaintiffs' failure to file the proof of loss within 60 days as required by the insurance policy. At the time the notice of loss was filed, FEMA knew that plaintiffs were claiming the total loss of their house. Furthermore, through its investigation of this claim, FEMA knew everything that plaintiffs were required to provide in the proof of loss. This is evident from FEMA's submission of the proof of loss which plaintiffs rejected when they rejected FEMA's settlement offer of $200.79. For these reasons, the Court concludes that the doctrine of equitable estoppel should be applied in this case to prevent FEMA from asserting plaintiffs' failure to file a proof of loss as a defense to their claim.

The Court now considers the merits of plaintiffs' claim. In this lawsuit plaintiffs allege a total loss of their house as a result of flood-related erosion. The Standard Flood Insurance Policy issued to plaintiffs insured them against direct losses by "flood" which is defined by the policy as follows:

> Wherever in this policy the term "flood" occurs, it shall be held to mean
>
> A. A general and temporary condition of partial or complete inundation of normally dry land areas from:

1. The overflow of inland or tidal waters.

2. The unusual and rapid accumulation of runoff of surface waters from any source.

3. Mudslides (i.e., mudflows) which are proximately caused or precipitated by accumulations of water on or under the ground.

B. The collapse or subsidence of land along the shore of a lake or other body of water as a result of erosion or undermining caused by waves or currents of water exceeding the cyclical levels which result in flooding as defined in A–1 above.

■ While Paragraph B quoted above provides that the insurance policy covers losses caused by erosion which is the result of flooding, Paragraph D of the insurance contract makes it explicit that the insurer is not liable for any losses caused by "landslide or any other earth movement except mudslide or erosion as is covered under the peril of flood." Based on its reading of the insurance contract, the Court concludes that only erosion caused by flooding, as that term is defined in the insurance policy, is covered under the policy and no coverage is provided for ongoing erosion occurring along the Lake Michigan shoreline. Therefore, in this civil action plaintiffs must establish by a preponderance of the evidence that their loss was the result of flood-related erosion to prevail on their claim.

The evidence clearly established that plaintiffs suffered some damage to their house as a result of erosion. While the record shows that erosion is an ongoing process along the Lake Michigan shoreline, the evidence also demonstrates that the rate of erosion at the Hidenfelter property increased dramatically during the period from 1969 through 1976 in part as a result of high water levels on Lake Michigan. The only issue is whether the erosion which caused damage to plaintiffs' house was "flood" related as that term is defined in the insurance contract.

In light of the evidence produced at trial regarding the normal fluctuations in Lake Michigan water levels, the Court concludes that the high water levels during the period from mid-1969 through 1976 did not constitute a flood as that term is defined in the insurance policy. Consequently, the Court rejects any argument that those high water levels on Lake Michigan brought all of the erosion occurring during this period within the coverage of Paragraph B of the insurance policy.

This conclusion is supported by the legislative history of the 1973 amendments to the National Flood Insurance Act which extended protection under the Standard Flood Insurance Policy to losses caused by abnormal erosion. In describing the new provision, the report of the Senate Banking, Housing and Urban Affairs Committee states:

As the debate on the house floor made clear, such erosion coverage is appropriate for the purposes of this program only to the extent that it is flood-related; that is, suddenly caused by an unusually high water level in a natural body of water, accompanied by a severe storm, or by an unanticipated force of nature, such as a flash flood or an abnormal tidal surge, or by some similarly unusual and unforeseeable event. The amendment is not intended to provide coverage for the losses incurred when properties built too close to shorelines are eventually damaged as a result of normal and continuous wearing away of land by ordinary wave action. If the loss is gradual and takes place over the course of years, it would not be covered.

S.Rep. No. 583, 93rd Cong., 1st Sess., *reprinted in* 1973 U.S.Code Cong. & Ad. News 3217, 3229. Plaintiffs have not demonstrated that the damage to their house was proximately caused by any event which fits the definition of a "flood" under the insurance policy.

For the reasons stated above, this Court concludes that plaintiffs have failed to establish by a preponderance of the evidence that they are entitled to benefits under the Standard Flood Insurance Policy issued to them under the National Flood Insurance

Act. Accordingly, judgment is hereby entered in favor of the defendant and against plaintiffs.